**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**

**CASE NO.: 0:20-cv-61741-RS**

GIO PIZZERIA & BAR HOSPITALITY, LLC
and GIO PIZZERIA BOCA, LLC,  individually
and on behalf of all others similarly situated,

       Plaintiffs,

v.

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON SUBSCRIBING TO POLICY
NUMBERS ARP-74910-20 and ARP-75209-20,

       Defendants.

_____/

**DEFENDANTS CERTAIN UNDERWRITERS' AT LLOYD'S, LONDON SUBSCRIBING**
**TO POLICY NUMBERS ARP-74910 AND ARP-75209-20'S**
**MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT AND**
**INCORPORATED MEMORANDUM OF LAW**

**INTRODUCTION**

       Plaintiffs in this putative class action, Gio Pizzeria & Bar Hospitality, LLC and Gio Pizzeria Boca, LLC ("Plaintiffs"), seek insurance coverage for business interruption related to the COVID-19 pandemic from Defendants Certain Underwriters at Lloyd's, London Subscribing to Policy Nos. ARP-74910-20 and ARP-75209-20 (collectively, "Underwriters").

       Plaintiffs' First Amended Complaint ("Amended Complaint") must be dismissed for several reasons. First, for the policy's Business Income coverage to apply, there must be a direct physical loss of or damage to the insured property. Plaintiffs' Amended Complaint fails to sufficiently allege that fundamental predicate, nor could they ever do so under the alleged circumstances. Second, Plaintiffs fail to sufficiently allege that a civil authority prohibited access to insured property because of direct physical damage to nearby property, which are the requirements for "civil authority" coverage. Third, even if those policy requirements are properly alleged, the policy expressly excludes any losses related to substances that pose a threat to human health. Plaintiffs' claims arise out of SARS-CoV-2, the Novel Coronavirus that causes COVID-19, which poses a threat to human health. Lastly, the Amended Complaint fails to sufficiently

allege causes of action for breach of contract, as Plaintiffs provide no supporting facts to support their claims. Accordingly, Underwriters' Motion to Dismiss should be granted.

## I.     FACTUAL BACKGROUND

### A.     THE POLICIES

Gio Pizzeria & Bar Hospitality LLC ("Gio Pizzeria") owns and operates a restaurant named "Nick's New Haven Style Pizzeria & Bar" in Coral Springs, Florida. (Doc. 16 ¶ 1). Gio Pizzeria Boca, LLC ("Gio Pizzeria Boca") owns and operates a restaurant in Boca Raton, Florida, also named "Nick's New Haven Style Pizzeria & Bar." (*Id.*). Underwriters subscribed to two policies that insure the properties on which the restaurants are located (the "Properties").[1] Policy No. ARP-74910-20 was issued to Gio Pizzeria for the policy period of June 1, 2019, to June 1, 2020 (Exhibit A),[2] and Policy No. ARP-75209-20 was issued to Gio Pizzeria Boca for the policy period of February 21, 2020, to February 21, 2021 (Exhibit B).

The Policies' insuring clauses provide that Underwriters "will pay for direct physical loss of or damage to Covered Property at the Premises described in the Declarations caused by or resulting from any Covered Cause of Loss." (Policies, Exhibits A & B, Form CP 00 10 10 12, at p. 1 of 16). "Covered Cause of Loss" is defined as "direct physical loss unless the loss is excluded or limited in this policy." (Policies, Exhibits A & B, Form CP 10 30 10 12, at p. 1 of 10). While the Policies do provide coverage for loss of "Business Income," the loss must also arise out of direct physical loss of or damage to the insured property:

### 1.  Business Income

* * *

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". ***The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations*** and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

(Policies, Exhibits A & B, Form CP 00 30 10 12, at p. 1 of 9) (emphasis added).

The Policies also provide coverage for "Extra Expense" which is defined as "necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no ***direct physical loss or damage to property*** caused by or resulting from a Covered

---

[1]  The insured properties are identified on the Declarations Pages of the Policies.

[2]  Both the Policies are attached to the Amended Complaint and reattached here for the Court's convenience. They are referred collectively here as the "Policies." Except for their applicable limits and policy periods, the Policies afford nearly identical coverage.

Cause of Loss." (Policies, Exhibits A & B, Form CP 00 30 10 12, at p. 1 of 9) (emphasis added). "Business Income" coverage is only provided during the "period of restoration," which is defined as:

> … the period of time that:
>
> a.  Begins:
>
>   (1) 72 hours after the time of ***direct physical loss or damage*** for Business Income Coverage; or
>
>   (2) Immediately after the time of ***direct physical loss or damage*** for Extra Expense Coverage;
>
>   caused by or resulting from any Covered Cause of Loss at the described premises; and
>
> b.  Ends on the earlier of:
>
>   (1) The date when the property at the described premises ***should be repaired, rebuilt or replaced*** with reasonable speed and similar quality; or
>
>   (2) The date when business is resumed at a new permanent location.

(Policies, Exhibits A & B, Form CP 00 30 10 12, at p. 9 of 9) (emphasis added). Thus, the Policies do not provide coverage for business income or extra expense if the losses are caused by something other than direct physical loss or damage resulting from a covered cause of loss. Even then, coverage is only provided for that time needed to repair, rebuild, or replace the lost or damaged property.

The Policies provide "Civil Authority" coverage. Again, consistent with the fundamental principle of a property insurance policy, direct physical loss or damage to property is required, and access to the premises must be prohibited:

> **a.  Civil Authority**
>
> In this Additional Coverage, Civil Authority, the described premises are premises to which this Coverage Form applies, as shown in the Declarations.
>
> When a ***Covered Cause of Loss causes damage to property other than property at the described premises***, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by ***action of civil authority that prohibits access to the described premises***, provided that both of the following apply:
>
> (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority ***as a result of the damage***, and the described premises are within that area but are not more than one mile from the damaged property; and
>
> (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

> Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

(Policies, Exhibits A & B, Form CP 00 30 10 12, at p. 2 of 9). The Policies contain endorsements that modify the Civil Authority coverage, but none of those modifications change the basic coverage requirements of direct physical loss of or damage to nearby property and a prohibition on access to the insured property because of such damage. (Policies, Exhibits A & B, Form CP 01 25 02 12, at p. 2 of 3).

The Policies also contain certain applicable exclusions, including broad pollution/contamination exclusions. (Policies, Exhibits A & B, Form NMA2342 and Form CP 10 30 10 12, at p. 4 of 10).

## B.    THE INSURANCE CLAIM

On March 26, 2020, Plaintiffs submitted claims for business interruption as a result of Florida state and local orders related to COVID-19 (the "Claims"). Plaintiffs then filed this lawsuit. (Doc. 1). In the Amended Complaint, Plaintiffs allege that the "the presence of COVID-19 has resulted in physical damage to property." (Doc. 16 ¶ 32). Plaintiffs also allege that they were "forced to suspend or reduce business" at the Properties. (*Id*. at ¶ 15). Notably, however, the Amended Complaint is devoid of any allegations that Plaintiffs' restaurants were, in fact, closed or that Plaintiffs (or their employees) were prohibited from accessing the premises as a result of COVID-19 or any related governmental orders. Similarly, the Amended Complaint fails to provide an adequate description of the "direct physical loss and damage," but instead gives an incomplete recitation of the various orders.[3]

On March 16, 2020, the city of Boca Raton declared a State of Emergency, directing bars and nightclubs to close but permitted restaurants to stay open for take-out and delivery. (Doc. 16 ¶ 43; Exhibit C, City of Boca Raton Emergency Declaration).[4] On March 17, 2020, Florida

---

[3] Plaintiffs cite several governmental orders throughout the country to support the proposition that "many governmental bodies specifically found that COVID-19 causes property damage when issuing stay at home orders." (Doc. 16 ¶ 37). These orders are not relevant or applicable to the interpretation of a commercial property policy or the interpretation of the phrase "direct physical loss of or damage."

[4] The government orders are a matter of public record. When ruling on a motion to dismiss, this Court may consider matters of which judicial notice may be taken, including public records. *See Myers v. Foremost Ins. Co.*, No. 8:15-CV-1363-MSS-JSS, 2015 WL 12830477, at *3 (M.D. Fla. Oct. 23, 2015) (citing *SFM Holdings, Ltd. v. Banc of Am. Secs., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010)).

Governor Ron DeSantis issued Executive Order ("EO") 20-68, directing restaurants to adhere to social distancing guidelines by limiting the number of patrons and requiring patrons to maintain a six-foot distance. (Doc. 16 ¶ 44; Exhibit D, Florida EO 20-68). On March 18, 2020, the city of Coral Springs issued Emergency Order 2020-05, requiring restaurants and other places that serve food for consumption on premises to maintain a six-foot distance between patrons. (Doc. 16 ¶ 45; Exhibit E, Coral Springs Emergency Order 2020-05). On March 20, 2020, Governor DeSantis issued EO 20-71, requiring restaurants to suspend on-premises dining but allowing restaurants to remain operational for delivery and take-out services. (Doc. 16 ¶ 46; Exhibit F, Florida EO 20-71). This order expressly allowed employees and other personnel to access the establishments. (*Id.*).

On March 22, 2020, Broward County issued EO 20-01, directing the closure of non-essential businesses; however, restaurants were deemed essential. (Doc. 16 ¶ 47; Exhibit G, Broward County EO 20-01). On March 24, 2020, Governor DeSantis issued EO 20-83, encouraging high risk individuals to stay at home and limiting the size of social gatherings. (Doc. 16 ¶ 48; Exhibit H, Florida EO 20-83). On March 30, 2020, Governor DeSantis issued EO 20-89, requiring Miami-Dade, Broward, Palm Beach, and Monroe Counties to restrict public access to non-essential businesses pursuant to the guidelines set by Miami-Dade County Emergency Order 07-20. (Doc. 16 ¶ 49; Exhibit I, Florida EO 20-89). On April 1, 2020, Governor DeSantis issued EO 20-91, directing individuals to stay at home except to obtain essential services. (Doc. 16 ¶ 50; Exhibit J, Florida EO 20-91). On May 14, 2020, Governor DeSantis issued EO 20-123, allowing restaurants to resume indoor dining at 50% capacity and outdoor dining with social distancing measures. (Doc. 16 ¶ 51; Exhibit K, Florida EO 20-123). On June 3, 2020, Governor DeSantis issued EO 20-139, allowing bar areas at restaurants to open for seated service. (Doc 16 ¶ 51; Exhibit L, Florida EO 20-139).

All these measures were put in place to slow the spread of COVID-19 by minimizing contact between residents. These orders were not issued as a result of any "direct physical loss of or damage" to property, as required under the Policies to trigger coverage. Moreover, the orders did not "prohibit access" to the Properties, as they specifically allow employees and other personnel to enter the premises. In fact, the April 1, 2020 order encouraged restaurants to "provide delivery, carry-out or curbside service." (Exhibit J).

## II.    LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *See Jacobs v. Tempur-Pedic Int'l., Inc*., 626 F.3d 1327, 1332-33 (11th Cir. 2010).

A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief," but must allege more than "labels and conclusions," "formulaic recitation of the elements of a cause of action," or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Courts are not required to accept the labels and legal conclusions in the complaint as true. *See Sinaltrainal v. Coca-Cola Co*., 578 F.3d 1252, 1261 (11th Cir. 2009).

To survive a motion to dismiss, a complaint must contain facts that, when assumed to be true, sufficiently "state a claim to relief that is *plausible on its face*." *Iqbal*, 556 U.S. at 678 (emphasis added). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.; see also Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) ("conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal"). A complaint that does not "contain sufficient factual matter, accepted as true, to state a claim . . . plausible on its face" is subject to dismissal. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (citing *Twombly*, 550 U.S. at 570).

Moreover, "when the allegations of the complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (citation and quotations omitted).

## III.    ARGUMENT

### A.    PLAINTIFFS' AMENDED COMPLAINT FAILS TO ALLEGE DIRECT PHYSICAL LOSS OF OR DAMAGE TO INSURED PROPERTIES

The Policies provide coverage for business income and extra expense losses if such losses are the result of "direct physical loss of or damage to" the Properties. (Policies, Exhibits A & B, Form CP 00 30 10 12, at p. 1 of 9). Further, business income coverage and extra expense are only provided during the "period of restoration," which is the time it takes to repair, rebuild or replace the Properties. (Policies, Exhibits A & B, Form CP 00 30 10 12, at p. 9 of 9). Here, the Amended Complaint contains no plausible allegations of direct physical loss of or damage to the Properties, as evidenced by the failure to identify anything to repair, rebuild or replace at the Properties.

The plain language of the Policies "requires direct physical loss or damage to the properties in order to trigger payment" for a business income loss. *See Lubell & Rosen LLC v.*

*Sentinel Ins. Co.*, Ltd., No. 0:16-CV-60429-WPD, 2016 WL 8739330, at *4 (S.D. Fla. June 10, 2016). Florida law places the initial burden on an insured seeking to recover under an all-risk policy of proving that a loss occurred.  *See S.O. Beach Corp. v. Great Am. Ins. Co. of N.Y.*, 305 F. Supp. 3d 1359, 1364 (S.D. Fla. 2018), *aff'd*, 791 F. App'x 106 (11th Cir. 2019). An insured's pleading must sufficiently allege that its losses are covered within a policy's insuring agreement. *See Timber Pines Plaza, LLC v. Kinsale Ins. Co.*, 192 F. Supp. 3d 1287, 1293 (M.D. Fla. 2016).

Accordingly, to recover for business income loss, Plaintiffs must plead and then prove that they sustained damage to the property that is insured by their Policies, that the damage was caused by a covered cause of loss, and that there was an interruption to their businesses that was caused by the property damage. *Dictiomatic, Inc. v. U.S. Fid. & Guar. Co*., 958 F. Supp. 594, 602 (S.D. Fla. 1997); *cf. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Texpak Grp. N.V*., 906 So. 2d 300, 302 (Fla. 3d DCA 2005) ("business interruption and extra expense losses are covered only if 'resulting from' damage or destruction of real or personal property caused by a covered peril"). In the Amended Complaint, Plaintiffs merely allege that the "presence of COVID-19 caused direct physical loss of or damage to the covered property . . . by impairing and damaging the covered property, and by causing a necessary suspension of operations." (Doc. 16 ¶ 36). Plaintiffs also allege that "COVID-19 caused direct physical loss and damage" to the Properties. (*Id*. at ¶ 76).

Under the federal rules, pleading the bare elements of a claim is insufficient—Plaintiffs "must include some supporting facts." *N.P.V. Realty Corp. v. Nationwide Mut. Ins. Co*., No. 8:11-CV-1121-T-17TBM, 2011 WL 4948542, at *4 (M.D. Fla. Oct. 17, 2011). While Plaintiffs make conclusory allegations that the Properties have suffered direct physical damage, the Amended Complaint is devoid of any mention of what physical damage occurred, how the physical damage occurred, when the physical damage occurred, and what needs to be repaired, replaced, or rebuilt. Further, though Plaintiffs contend that COVID-19 was present at the Properties, the Amended Complaint is devoid of any facts supporting such a conclusory statement. Accordingly, none of Plaintiffs' allegations, even if taken as true, state a plausible claim that the Properties sustained "direct physical loss or damage" as required to trigger coverage under the Policies. *See Timber Pines Plaza, LLC v. Kinsale Ins. Co.*, No. 8:15-cv-1821-T-17TBM, 2016 WL 8943313, at *2 (M.D. Fla. Feb. 4, 2016) ("[I]t is not sufficient to plead that the Plaintiff has suffered damages in the form of 'direct physical damage to its property.'").

The phrase "direct physical loss or damage" "must be given its common meaning." *Rockhill Ins. Co. v. Northfield Ins. Co*., 297 F. Supp. 3d 1279, 1286 (M.D. Fla. 2017). This Court

has concluded that "[a] direct physical loss 'contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so.'" *Mama Jo's, Inc. v. Sparta Ins. Co.*, No. 17-cv-23362-KMM, 2018 WL 3412974, at *9 (S.D. Fla. June 11, 2018), *aff'd*, No. 18-12887, 2020 WL 4782369 (11th Cir. Aug. 18, 2020) (quotations omitted)). If the property can be cleaned and restored to its original function, no covered loss has been suffered. *Id.* (stating that "cleaning is not considered direct physical loss"). The relevant inquiry is whether the structure continues to function. Indeed, "[t]he fact that the restaurant needed to be cleaned more frequently does not mean [the plaintiff] suffered a direct physical loss or damage." *Id.* Furthermore, as stated by the oft-cited Couch on Insurance, and as explicitly adopted by this Court:

> The requirement that the loss be "physical," given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.

*Id.* (quoting 10A Couch on Ins. § 148:46 (3d. Ed. West 1998)); *see also Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002) ("In ordinary parlance and widely accepted definition, physical damage to property means 'a distinct, demonstrable, and physical alteration' of its structure.").

Several courts have already found that the SARS-CoV-2 virus, the disease it causes (COVID-19), and the related governmental orders do not cause physical loss of or damage to property. The Western District of Texas granted an insurer's motion to dismiss finding that an insured plaintiff failed to sufficiently allege a "direct physical loss" caused by COVID-19 or the related governmental orders. *See Diesel Barbershop, LLC v. State Farm Lloyds*, No. 5:20-CV-461-DAE, 2020 WL 4724305 (W.D. Tex. Aug. 13, 2020).[5] Notably, the court found that the phrase "direct physical loss" requires "a distinct demonstrable physical alteration of the property" and rejected the insured's arguments that "direct physical loss" includes loss of use of property. *Id.* at *5 (citations omitted); *see also Inns by the Sea v. Ca. Mut. Ins. Co.*, No. 20CV001274 (Cal. Super. Ct. Aug. 6, 2020) (granting insurer's demurrer to insured's COVID-19 related complaint on the grounds that allegations failed to state sufficient facts to constitute a cause of action) (Order and Transcript attached hereto as Exhibit N). The Central District of California and a superior court in

---

[5] A copy of this order is attached hereto as Exhibit M.

the District of Columbia held that the government-ordered closure of restaurants because of COVID-19 was not "direct physical loss" to trigger business income coverage. *See 10E, LLC v. Travelers Indem. Co.*, No. 2:20-CV-04418-SVW-AS, Dkt. 39 at 7 (C.D. Cal. Sept. 2, 2020) ("An insured cannot recover by attempting to artfully plead impairment to economically valuable use of property as physical loss or damage to property.")[6]; *Rose's 1, LLC v. Erie Ins. Exch.*, No. 2020-CA-002424-B, 2020 WL 4589206 (D.C. Super. Ct. Aug. 6, 2020).[7] In *Rose's*, consistent with the case law cited herein, the court held that the governmental orders "did not have any effect on the material or tangible structure of the insured properties." *Rose's*, 2020 WL 4589206 at *2; *see also Turek Enterprises, Inc. dba Alcona Chiropractic v. State Farm Mut. Auto. Ins. Co.,* No. 20-11655, Dkt. 23 at 14 (E.D. MI Sept. 3, 2020) (granting insurer's motion to dismiss COVID-19 related complaint because insured failed to "demonstrate some tangible damage to Covered Property.").[8]

Another court found there was no coverage for the insured's COVID-19 related business income loss because there was no direct physical loss of or damage to property. *See* Hearing, Motion for Summary Disposition at 27:20, *Gavrilides Mgmt. Co. v. Mich. Ins. Co.*, No. 20-000258-CB at 20:5-9 (Mich. Cir. Ct. July 1, 2020) (Transcript with Oral Findings attached hereto as Exhibit R) ("Plaintiff just can't avoid the requirement that there has to be something that physically alters the integrity of the property. There has to be some tangible, i.e. physical damage to the property.").[9]

In their Amended Complaint, Plaintiffs unsuccessfully attempt to rectify the shortcomings of their initial Complaint by alleging that the Properties have "suffered 'direct physical loss or

---

[6] A copy of this order is attached hereto as Exhibit O.

[7] A copy of this order is attached hereto as Exhibit P.

[8] A copy of this order is attached hereto as Exhibit Q.

[9] In the context of a lawsuit seeking injunctive relief against an insurer for business income coverage related to COVID-19, the Southern District of New York found that the virus and resulting disease does not cause physical loss or damage. *See* Teleconference, Order to Show Cause at 4-5, *Soc. Life Magazine, Inc. v. Sentinel Ins. Co. Ltd.,* No. 20-CV-3311-VEC (S.D.N.Y. May 14, 2020) (Transcript with oral findings attached hereto as Exhibit S). With regard to COVID-19, the court in *Soc. Life Magazine* aptly noted: "It damages lungs. It doesn't damage printing presses." (*Id.* at 4:25-5:4). Underwriters also refer the Court to Judge Torres's Report & Recommendations finding that under Florida law, a property must suffer actual damage, and the emergency closure orders impacting businesses did not cause actual damage. *Malaube, LLC v. Greenwich Ins. Co.*, No. 2022615CIVWILLIAMSTO, 2020 WL 5051581, at *8 (S.D. Fla. Aug. 26, 2020). There, Judge Torres has very recently issued a report and recommendation to grant the insurer's motion to dismiss the insured's COVID-19 related business income claim. Significantly, the *Malaube* plaintiff filed a notice of voluntary dismissal the day before the deadline to object to Judge Torres's Report & Recommendation. While not formally adopted, Judge Torres's analysis and recommendation nonetheless remain persuasive and consistent with the vast majority of decisions to date. A copy of this Report & Recommendations is attached hereto as Exhibit T.

FIELDS HOWELL LLP | 9155 SO. DADELAND BLVD. | SUITE 1012| MIAMI, FL 33156|T: 786-870-5600 | F: 855-802-5821

damage'" because "COVID-19 made the [Properties] unusable in a way that they had been used before." (Doc. 16 ¶ 2). Plaintiffs also puzzlingly allege that the loss is somehow "direct" because "Plaintiffs are not asking the Underwriters to reimburse them after someone obtained a judgement against [Plaintiffs]" but asking "Underwriters to pay for their loss of business income occasioned directly." (*Id.* at ¶ 4). Plaintiffs further allege the loss is "physical" because Plaintiffs "are unable to use their interior spaces in the manner in which they had previously used those spaces."[10] (*Id.* at ¶ 5). Plaintiffs then allege, through circular reasoning, that "[t]his loss is a loss" and further allege "[i]t is the loss of functionality of the space for businesses purposes. It is the diminishment of the physical space in the buildings." (*Id.* at ¶ 6). Finally, Plaintiffs allege that

> Due to COVID-19, their property has become unsafe for its intended purpose and thus has suffered physical loss or damage. Their properties' business functions have been impaired. If they were to conduct business as usual, the disease and virus would show up and people would get sick. This is not a non-physical or remote loss such as one occasioned by breach of contract, loss of market, or the imposition of a governmental penalty. It is a direct physical loss. In its current condition, Plaintiffs'. . . property is not functional for its business purposes.

(*Id.* at ¶ 30).[11] Such strained arguments, while creative, fail for several reasons.

First, in *Mama Jo's*, this Court rejected the notion that loss of use equates to physical damage. *Mama Jo's*, 2018 WL 3412974, at *9. This decision was affirmed on August 18, 2020, by the Eleventh Circuit where the court found that

> A "loss" is the diminution of value of something . . ."Direct" and "physical" modify loss and impose the requirement that the damage be actual . . . With regard to the cleaning claim . . . "cleaning and painting" was all that was required. . . there was no need for removal or replacement of items at that time . . . We conclude that the district court correctly granted summary judgment on [the insured's] cleaning claim because, under Florida law, an item or structure that merely needs to be cleaned has not suffered a "loss" which is both "direct" and "physical."

*Mama Jo's Inc. v. Sparta Ins. Co.,* No. 18-12887, 2020 WL 4782369 at *8 (11th Cir. Aug. 18, 2020) (quotations and citations omitted). The alleged presence of COVID-19 is like the presence of the road dust in *Mama Jo's*. If road dust on an insured's property that necessitates cleaning does

---

[10] In a footnote, Plaintiffs allege they are not seeking recovery for loss of use. How these allegations do not amount to allegations of loss of use of the Properties is lost on Underwriters, as Plaintiffs are alleging that they cannot use the "use their interior spaces as intended." (Doc. 16. ¶ 5 n. 1).

[11] Plaintiffs' allegations that the Properties are "unsafe" because the "virus would show up and people would get sick" demonstrates that the danger posed by COVID-19 threatens human health, not property.

FIELDS HOWELL LLP | 9155 SO. DADELAND BLVD. | SUITE 1012| MIAMI, FL 33156| T: 786-870-5600 | F: 855-802-5821

not cause physical loss or damage, then a virus that is invisible to the naked eye, and which can also be cleaned effectively with something as simple as Lysol spray, would also not cause such physical loss or damage.

Authorities from other jurisdictions also recognize the principal that mere loss of use does not equate to direct physical loss of or damage to property. *See Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 331 (S.D.N.Y. 2014) ("The words 'direct' and 'physical,' which modify the phrase 'loss or damage,' ordinarily connote actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure."); *Roundabout Theatre Co. v. Continental Casualty Co.*, 302 A.D.2d 1, 7 (N.Y. App. Div. 2002) (rejecting insured's argument that "loss" should be read to include "loss of use" and holding there was no "direct physical loss or damage" after the insured's theatre became inaccessible because of a nearby street closure after a construction accident as the policy unambiguously required direct physical damage to the insured premises for coverage); *cf. Pentair Inc. v. Am. Guar. & Liab. Ins. Co.*, 400 F. 3d 613, 615 (8th Cir. 2005) (finding the inability of an insured's suppliers to function after a power failure did not constitute physical loss or damage to the premises as adopting the insured's reasoning "would mean that direct physical loss or damage is established *whenever* property cannot be used for its intended purpose") (emphasis in original).

Plaintiffs' remaining allegations concerning their "direct physical losses and damage" are solely economic in nature and do not relate to any sort of physical damage and, therefore, are not covered under the Policies. *See Bahama Bay II Condo. Ass'n, Inc v. United Nat'l Ins. Co.*, 374 F. Supp. 3d 1274, 1278 (M.D. Fla. 2019) ("cost of security guards and security fencing . . .is not property damage, or 'physical loss . . .' but is an economic loss. There is nothing in the Policy that covers economic loss."). Moreover, multiple courts have rejected similar strained interpretations of the phrase "direct physical loss of or damage." *See e.g. 10E, LLC,* No. 2:20-cv-04418-SVW-AS, Dkt. 39 (referring to the complaint as "artfully plead") Exhibit R at 15 ("[T]his kind of business interruption needs some damage to the property . . .You get an A for effort, you get a gold star for creativity, but this is just not what's covered under these insurance policies."); Exhibit S at 20 ("[P]laintiff is saying that the physical requirement is met because people were physically restricted from dine-in services. But, that argument is just simply nonsense.").

Additionally, the Policies only provide coverage for business income and extra expense losses that occur during the "period of restoration," which begins with the "direct physical loss or

damage" and ends on the earlier of "(1) The date when the property at the described premises should be repaired, rebuilt or replaced . . . or (2) The date when business is resumed at a new permanent location." (Policies, Exhibits A & B, Form CP 00 30 10 12, at p. 9 of 9). Thus, for there to be coverage under the Policies' business income or extra expense coverage, Plaintiffs' losses must involve some physical damage to covered property that needs to be repaired, rebuilt, or replaced. As explained by the Southern District of New York, "the words 'repair' and 'replace' contemplate physical damage to the insured premises as opposed to loss of use of it." *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 332 (S.D.N.Y. 2014) (citations omitted); *see also Phila. Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280, 287 (S.D.N.Y. 2005) ("'Rebuild,' 'repair' and 'replace' all strongly suggest that the damage contemplated by the Policy is physical in nature.").

Any other reading of the Policies to allow recovery for Plaintiffs' Claims would render central contract terms superfluous. Under Florida law, "insurance contracts are construed according to their plain meaning." *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005). Further, "courts must not construe insurance policy provisions in isolation, but instead should read all terms in light of the policy as a whole, with every provision given its full meaning and operative effect." *Office Depot, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 734 F. Supp. 2d 1304, 1314 (S.D. Fla. 2010) (citations omitted). Courts may not "rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1138 (Fla. 1998). Thus, under the plain language of the Policies, coverage is only afforded for business income and extra expense losses, if those losses are caused by direct physical loss or damage. The Amended Complaint fails to allege any facts that trigger that coverage.

### B.   PLAINTIFFS HAVE NOT PLED A VALID "CIVIL AUTHORITY" CLAIM

The allegations also fail to trigger the Policy's civil authority coverage. Under Florida law, the "policyholder bears the initial burden of proving that a loss occurred under the insuring agreement during the policy period." *Somethings Fishy Enter., Inc. v. Atl. Cas. Ins. Co.*, 415 F. Supp. 3d 1137, 1142 (S.D. Fla. 2019). The civil authority coverage requires direct physical loss or damage to property near the insured property and further requires that access to the insured property is prohibited because of that damage. Plaintiffs' efforts to obtain civil authority coverage fail because the Amended Complaint fails to allege (1) such physical damage, and (2) that access to the Properties has been prohibited because of such damage.

In the Amended Complaint, Plaintiffs allege that "[t]he presence of COVID-19 caused direct physical loss of or damage to the covered property . . . by impairing and damaging the covered property, and by causing a necessary suspension of operations during a period of restoration." (Doc. 16 ¶ 55). Then, Plaintiffs allege that the subject government orders prohibited access to their Properties, as well as the "area immediately surrounding" the Properties. (Doc. 16 ¶ 56). However, these orders did not require the restaurants to close or prohibit access to the surrounding areas. In fact, Governor DeSantis encouraged all restaurants to continue providing take-out, delivery, and curbside services. (*See* Exhibit J).

Plaintiffs appear to assert that the subject government orders somehow trigger the Policies' coverage extension for civil authority coverage. (*See* Doc. 16 ¶¶ 16, 37, 84, 118). However, "[c]ivil authority coverage is intended to apply to situations where access to an insured's property is prevented or prohibited by an order of civil authority issued as a direct result of physical damage to other premises in the proximity of the insured's property." *See, e.g.*, *Dickie Brennan & Co. v. Lexington Ins. Co.*, 636 F.3d 683, 686-87 (5th Cir. 2011).[12] As explained above, COVID-19 does not cause physical damage or loss to property, and therefore, Plaintiffs cannot satisfy the conditions of the civil authority coverage extension. Even looking beyond that shortcoming, there are two more reasons why Plaintiffs cannot fulfill the conditions of the civil authority coverage extension: (1) access to the Properties has not been "prohibited;" and (2) the subject government orders were not taken "in response" to damaged property.

First, Plaintiffs' allegations that the subject government orders "prohibited access" to their Properties "and the area immediately surrounding" their Properties are demonstrably false. (Doc. 16 ¶ 56). As previously detailed, Plaintiffs were never required to cease delivery, take-out, or pick-up services. No government order prevented Plaintiffs themselves, or their employees, from entering the Properties, and indeed certain orders actually encouraged access. Although Florida courts do not appear to have considered the issue, numerous other courts have recognized that government orders that hamper access to insured property—but do not entirely *prohibit* it— are insufficient to trigger civil authority coverage. *See, e.g.*, *S. Hosp., Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137, 1140 (10th Cir. 2004) (upholding denial of hotel operators' claim for lost business income sustained when customers cancelled visits due to order grounding flights after the 9/11

---

[12] The Western District of Texas recently relied on the *Dickie Brennan* opinion in holding that an identical civil authority provision was not triggered by a similar COVID-19 business income claim. *See Diesel Barbershop, LLC v. State Farm Lloyds*, No. 5:20-CV-461-DAE, 2020 WL 4724305, at *7 (W.D. Tex. Aug. 13, 2020).

attacks); *Kean, Miller, Hawthorne, D'Armond McCowan & Jarman, LLP v. Nat'l Fire Ins. Co. of Hartford*, No. 06-770-C, 2007 WL 2489711, at *1 (M.D. La. Aug. 29, 2007) (holding that civil authority provision was not triggered by Louisiana government order prior to Hurricane Katrina advising residents to stay off the streets because advisories did not "prohibit access" to the insured premises); *54th St. Partners v. Fid. & Guar. Ins. Co.*, 305 A.2d 67, 67 (N.Y. Super. Ct. App. Div. 2003) (holding that civil authority extension did not apply to insured's business income claim due to city government's diversion of traffic in the proximity of its restaurant, because access to the restaurant was not denied). Since the civil authority extension requires Plaintiffs to show that access to their Properties was "prohibited" by civil authority, and Plaintiffs did not make any such allegations (nor indeed could they), the civil authority coverage does not apply.

Second, the subject government orders were not issued "in response" to physical damage to nearby property. Rather, the orders were issued as precautionary measures to prevent the further spread of COVID-19. In such situations, the civil authority extension is not triggered. *See Syufy Enter. v. Home Ins. Co. of Ind.*, No. 94-0756 FMS, 1995 WL 129229 (N.D. Cal. Mar. 21, 1995). In *Syufy*, after the return of the Rodney King verdict and subsequent riots, three cities imposed dawn-to-dusk curfews. *Id.* at *1. An insured movie theater operator, who ran theaters in all three cities, brought a business interruption claim because it closed its theaters during these curfew periods. *Id.* The court concluded there was no civil authority coverage because not only did the civil orders not specifically prohibit individuals from entering the theaters, but the "requisite causal link between damage to adjacent property and denial of access to a Syufy theater [was] absent." *Id.* at *2. In other words, Syufy had closed its theaters as a "direct result of the city-wide curfews," not as a result of adjacent property damage. Furthermore, the court noted that even though the curfews were imposed to "prevent" property damage, they were not the result of the damage itself. *Id.* at *2. Other courts have reached similar conclusions. *See United Airlines, Inc. v. Ins. Co. of State of Pa.*, 385 F. Supp. 2d 343, 353 (S.D.N.Y. 2005) (holding civil authority coverage did not apply to airport's business interruption claim arising from order grounding flights and barring access to the airport after 9/11, because the order was "to prevent further attacks and as a matter of national security," not because of damage to the Pentagon); *City of Chi. v. Factory Mut. Ins. Co.*, No. 02-C-7023, 2004 WL 549447, at *4 (N.D. Ill. Mar. 18, 2004) ("The business interruption . . . was due to the ground stop order imposed by the FAA in order to prevent further terrorist attacks."); *cf. Prime Alliance Grp., Ltd. v. Hartford Fire Ins. Co.*, No. 06-22535-CIV-UNGARO, 2007 WL 9703576, at *4 (S.D. Fla. Oct. 19, 2007) ("[A] plain language reading of this section

provides coverage when a peril—such as a windstorm—causes damage to property and, as a result, access to property is precluded by a civil authority order. The order of civil authority cannot in any reasonable manner be construed as a 'peril.'").

Plaintiffs cannot establish that physical damage occurred due to COVID-19, nor can they establish that the government orders, as specified and incorrectly characterized in the Amended Complaint, prohibited access to the Properties. Moreover, these government orders were not taken "in response" to physical damage, but were instead preventative measures issued for public health purposes. Accordingly, the Policies' civil authority coverage is not triggered.

## C.     COVERAGE IS BARRED BY THE CONTAMINATION EXCLUSIONS

The Amended Complaint must be dismissed because Plaintiffs' Claims are excluded from coverage by the plain language of the Policies. When resolving insurance coverage disputes, courts "routinely dismiss complaints for failure to state a claim when a review of the insurance policy and the underlying claim for which coverage is sought unambiguously reveals that the underlying claim is not covered." *Cammarota v. Penn-Am. Ins. Co.*, No. 17-CV-21605-Williams, 2017 WL 5956881, at *2 (S.D. Fla. Nov. 13, 2017); *see also Arias-Bonello v. Progressive Select Ins. Co.*, No. 0:17-CV-60897-UU, 2017 WL 7792704, at *5 (S.D. Fla. Aug. 8, 2017) (dismissing putative class member's breach of contract claims because the claims were expressly excluded from the policy). Here, even if Plaintiffs could plead claims within the Policies' coverage grants (which they have not), the Policies contain two enforceable exclusions barring coverage for contaminants and contamination. First, the Policies provide:

> SEEPAGE AND/OR POLLUTION AND/OR CONTAMINATION EXCLUSION USA & CANADA
>
> Notwithstanding any provisions to the contrary within the Policy of which this Endorsement forms part (or within any other Endorsement which forms part of this Policy, this ***Policy does not insure***:
>
> (a) ***any loss, damage, cost or expense***, or
>
> (b) any increase in insured loss, damage, cost or expense…
>
>          * * *
>
> which arises from any kind of seepage or any kind of pollution and/or contamination, or threat thereof, whether or not caused by or resulting from a Peril Insured, or from steps or measures taken in connection with the avoidance, prevention, abatement, mitigation, remediation, clean-up or removal of such seepage or pollution and/or contamination or threat thereof.
>
>          * * *
>
> The term '***any kind of seepage or any kind of pollution and/or contamination***' as used in this Endorsement includes (but not limited to):

(a) seepage of, or pollution and/or contamination by, anything, including but not limited to, any material designated as 'hazardous material' by the United States Environmental Protection Agency or as 'hazardous material' by the United States Department of Transportation, or defined as a 'toxic substance' by the Canadian Environmental Protection Act for the purposes of Part II of that Act, or any substance designated or defined as toxic, dangerous, hazardous or deleterious to persons or the environment under any Federal, State, Provincial, Municipal or other law, ordinance or regulation; and

(b) **the presence, existence, or release of anything which endangers or threatens to endanger the health, safety or welfare of persons** or the environment.

(Policies, Exhibits A & B, Form NMA2340) (emphasis added).[13] The Policies also exclude any "loss or damage caused by or resulting from" the "[d]ischarge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss." (Policies, Exhibits A & B, Form CP 10 30 10 12, at p. 4 of 10). The term "pollutant" is defined, in part, as "any solid, liquid gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (Policies, Exhibits A & B, Form CP 00 30 10 12, at p. 9 of 9). Under the plain language of either of these exclusions (collectively, the "Pollution Exclusions"), and Florida law, coverage for the Claims is excluded.

The Florida Supreme Court has recognized that pollution exclusions extend beyond merely "environmental or industrial pollution." *Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1138 (Fla. 1998) (holding that a claim arising from an ammonia spill fell within a pollution exclusion). Instead, the plain language of pollution exclusions should be enforced as written and Florida courts should not "place limitations upon the plain language of a policy exclusion simply because [they] may think it should have been written that way." *Id.* at 1139. This includes the term "contaminant," which the Florida Supreme Court held to be unambiguous. *See id.*

SARS-CoV-2, which causes COVID-19, undoubtedly qualifies as "contamination." This Court has recognized that "living organisms," "microbial populations," "microbial contaminants," and "indoor allergens" fit the ordinary definition of a "contaminant." *Nova Cas. Co. v. Waserstein*, 424 F. Supp. 2d 1325, 1334 (S.D. Fla. 2006). In *Nova*, the Court reasoned that these substances "infected the plaintiffs' bodies or made them impure by contact, thereby fitting the ordinary meaning of a 'contaminant,' and having an effect commonly known as 'contamination.'" *Id.*

---

[13] Notably, the "pollutant/contamination" exclusion applies "[n]otwithstanding any provision to the contrary" and it does not replace or supersede any similar provisions.

CASE NO.: 0:20-cv-61741-RS

Relatedly, a pollution exclusion has been expressly held to exclude coverage for a claim arising from "viral contaminants" and "harmful microbe[s]" found in an insured's swimming pool, from which a guest alleged that he contracted the Coxsackie virus. *See First Specialty Ins. Corp. v. GRS Mgmt. Assocs., Inc.*, No. 08-81356-CIV, 2009 WL 2524613, at *4-5 (S.D. Fla. Aug. 17, 2009); *see also James River Ins. Co. v. Epic Hotel, LLC*, No. 11-CV-24292-UU, 2013 WL 12085984, at *4 (S.D. Fla. Jan. 9, 2013) (applying pollution exclusion to bar claims arising from Legionnaire bacteria). Other courts have reached analogous conclusions. *See, e.g.*, *U.S. Fire Ins. Co. v. City of Warren*, 87 F. App'x 485, 487, 490 (6th Cir. 2003) (applying  pollution exclusion to sewage water that was alleged to contain "pathogens, carcinogens, and disease carrying organisms including but not limited to HIV viruses, *e. coli* bacteria, hepatitis (all strains), and other bacteria"); *Certain Underwriters at Lloyd's London v. B3, Inc.*, 262 P.3d 397, 400-401 (Okla. Ct. App. 2011) (holding a pollution exclusion applied to claim stemming from contaminated water alleged to contain, among other things, "bacteria (including E. Coli) [and] viruses").

The Policies' definitions of "contamination" and "pollutant" unambiguously encompass SARS-CoV-2 and the disease it causes. Just as this Court reasoned in *Nova*, SARS-CoV-2 is a virus that infects peoples' bodies, thereby fitting the ordinary meaning of "contaminant." *Nova Cas. Co.* 424 F. Supp. 2d at 1334. Similarly, under exclusions like the Policies' "pollution exclusion," claims stemming from viruses are precluded from coverage, as demonstrated by this Court's decision in *First Specialty Ins. Corp. See* 2009 WL 2524613, at *4-5. SARS-CoV-2 has been "designated or defined" as "dangerous" by both Federal and State ordinances or regulations. Indeed, the U.S. Department of Health and Human Services has determined that the "SARS coronavirus" (SARS-CoV), to which SARS-CoV-2 is related,[14] is a "biological agent . . . and toxin" with "the potential to pose a severe threat to public health and safety." 42 C.F.R. § 73.3(a) & (b) (2017). Moreover, in the subject orders issued by Governor DeSantis, the Governor stated that he is "responsible for meeting the *dangers* presented to this state and its people by [COVID-19]." (Exhibit F (emphasis added); *see also* Exhibit J). Thus, COVID-19 has been defined as dangerous to human health by both the federal government and government of Florida.

---

[14] *See COVID-19, MERS & SARS*, NAT'L INST. OF ALLERGY & INFECTIOUS DISEASES (April 6, 2020), https://www.niaid.nih.gov/diseases-conditions/covid-19; Alping Wu, et al, *Genome Composition & Divergence of the Novel Coronavirus (2019-nCov) Originating in China*, Commentary, 27 Cell Host & Microbe 325, 326 (Mar. 11, 2020) ("[T]he 2019-nCov is in the same *Betacoronavirus* clade as MERS-CoV, SARS-like bat CoV, and SARS-CoV.").

Having established that SARS-CoV-2 would qualify as a pollutant and/or contaminant under the Policies and Florida law, the Pollution Exclusions clearly apply, given that they exclude coverage for claims "arising from" or "resulting from" contamination. (Policies, Exhibits A & B, Form NMA2340). Causation phrases such as these are broadly construed in Florida. *See Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005) (holding that causation phrase "arising out of" is broader than "caused by" as used in an exclusion). Moreover, Plaintiffs assert that the subject government orders, which give rise to their Claims, were issued "in response to the rapid spread of COVID-19 throughout Florida." (Doc. 16 ¶ 54). Accordingly, the Claims as alleged arose from or resulted from COVID-19 and are excluded from coverage under the Policies.

### D.   COUNTS I, II, III AND IV FAIL TO ALLEGE UNDERWRITERS HAVE BREACHED THE POLICY

Plaintiffs have not stated valid claims for breach of contract. To sufficiently plead a claim for breach of contract under Florida law, a plaintiff must assert the existence of a contract, a breach of such contract, and damages resulting from such breach. *Knowles v. C.I.T. Corp*., 346 So.2d 1042, 1043 (Fla. 1st DCA 1977). While Plaintiffs' 132-paragraph Amended Complaint sets forth an expansive background facts section, it fails to allege specific facts supporting its claims of breach in Counts I, II, III, and IV.

Plaintiffs allege that "[b]y denying coverage" Underwriters "breached [their] coverage obligations" and conclusory allege that their alleged losses trigger the Policies' business income, civil authority, and extra expense coverages, and the Policies' sue and labor clauses. (Doc. 16 ¶¶ 76, 78, 84, 88, 93, 95, 101, 103). However, Plaintiffs fail to include necessary factual information to support these claims. These allegations are wholly conclusory and must, therefore, be dismissed. *See Whitney Nat. Bank v. SDC Communities, Inc.*, No. 809CV01788EAKTBM, 2010 WL 1270264, at *3 (M.D. Fla. Apr. 1, 2010) (dismissing breach of contract claims because plaintiff failed to allege sufficient factual information to support its claims); *Davidson v. Ga.*, 622 F.2d 895, 897 (11th Cir. 1980) ("When the allegations contained in a complaint are wholly conclusory ... and fail to set forth facts which, if proved, would warrant the relief sought, it is proper to dismiss for failure to state a claim.").

Moreover, even if Plaintiffs' allegations are considered true, Underwriters have not breached the Policy because there is no coverage for Plaintiffs' Claims. Accordingly, Plaintiffs have failed to sufficiently plead that coverage is provided by the Policies, as the express language of the Policies expressly contradicts Plaintiffs' allegations that their losses are covered under the

CASE NO.: 0:20-cv-61741-RS

Policies. *See Cruz v. Underwriters at Lloyd's London,* No. 8:14-CV-1539-T-33TBM, 2014 WL 3809179, at *4 (M.D. Fla. Aug. 1, 2014) (finding that plaintiff failed to sufficiently plead that its loss was covered under a policy, since the express language of an exclusion contradicted plaintiff's allegations that its claim was covered).

Furthermore, with regards to Plaintiffs' "Sue and Labor" claim, it is well-settled that "Sue and Labor" clauses require that "an actual covered loss must have occurred or be in process before the [insured] can recover under this provision for the expenses claimed." *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 168 (Fla. 2003); *see also Residences at Ocean Grande, Inc. v. Allianz Global Risks U.S. Ins. Co.*, No. 07-22656-CIV, 2009 WL 7020044, at *14 (S.D. Fla. Sept. 9, 2009). The Policies' Sue and Labor clauses specifically state that Underwriters "will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss." (Policies, Exhibits A & B, Form CP 00 30 10 12, p. 5 of 9). For the reasons set forth above, there is no covered loss under the Policies, and thus, the Sue and Labor provisions are not triggered. Accordingly Counts I, II, III, and IV for breach of contract must be dismissed.

## IV.    CONCLUSION

Plaintiffs have failed to satisfy their burden to plead facts that would give rise to a covered claim. Additionally, Plaintiffs cannot allege facts that sufficiently demonstrate they have suffered direct physical loss of or damage to their Properties. Even if Plaintiffs could allege a covered cause of loss, their Claims are unambiguously excluded under the Policies' Pollution Exclusions

Thus, for the foregoing reasons, Underwriters respectfully request the Court dismiss Plaintiffs' Amended Complaint.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was filed this 11th day of September, 2020 using the Court's CM/ECF filing system, which will send notice of the same to all interested persons, and served via email to those listed in the attached Service List.

FIELDS HOWELL LLP
Attorneys for Defendants, Underwriters
9155 So. Dadeland Blvd.
Suite 1012
Miami, FL 33156
Tel:  (786) 870-5600
Fax: (855) 802-5821

19

CASE NO.: 0:20-cv-61741-RS

By:*/s/ Armando P. Rubio*

Armando P. Rubio, Esq.
Florida Bar No. 478539
arubio@fieldshowell.com
service@fieldshowell.com

CASE NO.: 0:20-cv-61741-RS

## SERVICE LIST

Greg G. Gutzler
DICELLO LEVITT GUTZLER LLC
444 Madison Avenue, Fourth Floor
New York, New York 10022
ggutzler@dicellolevitt.com

Adam J. Levitt
Amy E. Keller
Daniel R. Ferri
Mark Hamill
Laura E. Reasons
DICELLO LEVITT GUTZLER LLC
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
alevitt@dicellolevitt.com
dferri@dicellolevitt.com
mhamill@dicellolevitt.com

Mark A. DiCello
Kenneth P. Abbarno
Mark Abramowitz
DICELLO LEVITT GUTZLER LLC
7556 Mentor Avenue
Mentor, Ohio 44060
madicello@dicellolevitt.com
kabbarno@dicellolevitt.com
mabramowitz@dicellolevitt.com

Mark Lanier
Alex Brown
Skip McBride
THE LANIER LAW FIRM PC
10940 West Sam Houston Parkway North
Suite 100
Houston, Texas 77064
WML@lanierlawfirm.com
alex.brown@lanierlawfirm.com
skip.mcbride@lanierlawfirm.com

Evan Janush
THE LANIER LAW FIRM PC
126 East 56th Street, Sixth Floor
New York, New York 10022
Evan.Janush@LanierLawFirm.com

Timothy W. Burns
Jeff J. Bowen
Jesse J. Bair
Freya K. Bowen
BURNS BOWEN BAIR LLP
One South Pinckney Street, Suite 930
Madison, Wisconsin 53703
tburns@bbblawllp.com
jbowen@bbblawllp.com
jbair@bbblawllp.com
fbowen@bbblawllp.com

Douglas Daniels
DANIELS & TREDENNICK
6363 Woodway, Suite 700
Houston, Texas 77057
douglas.daniels@dtlawyers.com