**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**

**CASE NO.: 0:20-cv-61741-RS**

GIO PIZZERIA & BAR HOSPITALITY, LLC
and GIO PIZZERIA BOCA, LLC,  individually
and on behalf of all others similarly situated,

      Plaintiffs,

v.

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON SUBSCRIBING TO POLICY
NUMBERS ARP-74910-20 and ARP-75209-20,

      Defendants.

_____/

**DEFENDANTS CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING**
**TO POLICY NUMBERS ARP-74910 AND ARP-75209-20'S**
**MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**
**AND INCORPORATED MEMORANDUM OF LAW**

**INTRODUCTION**

Plaintiffs in this putative class action, Gio Pizzeria & Bar Hospitality, LLC and Gio Pizzeria Boca, LLC ("Plaintiffs"), seek business income coverage related to the COVID-19 pandemic from Defendants Certain Underwriters at Lloyd's, London Subscribing to Policy Nos. ARP-74910-20 and ARP-75209-20 (collectively, "Underwriters").

Plaintiffs' Second Amended Complaint ("SAC") must be dismissed for several reasons. First, for the policies' Business Income coverage to apply, there must be a direct physical loss of or damage to the insured property. Plaintiffs' SAC fails to sufficiently allege that fundamental predicate, nor could they ever do so under the alleged circumstances. Second, Plaintiffs fail to sufficiently allege that a civil authority prohibited access to insured property because of direct physical damage to nearby property, which are the requirements for "civil authority" coverage. Third, even if those policy requirements are properly alleged, the policies expressly exclude any losses related to substances that pose a threat to human health. Plaintiffs' claims arise out of SARS-CoV-2, the Novel Coronavirus that causes COVID-19, which poses a threat to human health. Lastly, the SAC fails to sufficiently allege causes of action for breach of contract, as Plaintiffs

provide no supporting facts to support their claims. Accordingly, Underwriters' Motion to Dismiss should be granted.

<h1 style="text-align:center">I.    <u>FACTUAL BACKGROUND</u></h1>

**A.   THE POLICIES**

Gio Pizzeria & Bar Hospitality LLC ("Gio Pizzeria") and Gio Pizzeria Boca, LLC ("Gio Pizzeria Boca") each own and operate a restaurant named "Nick's New Haven Style Pizzeria & Bar" in Coral Springs and Boca Raton, Florida, respectively. (Doc. 38 ¶ 1). Underwriters subscribed to two policies (collectively, the "Policies") that insure the properties on which the restaurants are located (the "Properties").[1] Policy No. ARP-74910-20 was issued to Gio Pizzeria for the policy period of June 1, 2019 to June 1, 2020 (Exhibit A),[2] and Policy No. ARP-75209-20 was issued to Gio Pizzeria Boca for the policy period of February 21, 2020 to February 21, 2021 (Exhibit B).

The Policies insure against "direct physical loss of or damage to Covered Property at the Premises described in the Declarations caused by or resulting from any Covered Cause of Loss." (Policies, Exhibits A & B, Form CP 00 10 10 12, at p. 1 of 16). "Covered Cause of Loss" is defined as "direct physical loss unless the loss is excluded or limited in this policy." (Policies, Exhibits A & B, Form CP 10 30 10 12, at p. 1 of 10). While the Policies do provide coverage for loss of "Business Income," the loss must arise out of direct physical loss of or damage to the insured property:

**1.  Business Income**

* * *

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". ***The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations*** and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

(Policies, Exhibits A & B, Form CP 00 30 10 12, at p. 1 of 9) (emphasis added).

The Policies also provide coverage for "Extra Expense" which is defined as "necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no ***direct physical loss or damage to property*** caused by or resulting from a Covered

---

[1] The insured properties are identified on the Declarations Pages of the Policies.

[2] Both Policies are attached to the SAC and reattached here for the Court's convenience. Except for their applicable limits and policy periods, the Policies afford nearly identical coverage.

2

Cause of Loss." (*Id.*) (emphasis added). "Business Income" coverage is only provided during the "period of restoration," defined as:

> … the period of time that:
> a. Begins:
> (1) 72 hours after the time of ***direct physical loss or damage*** for Business Income Coverage; or
> (2) Immediately after the time of ***direct physical loss or damage*** for Extra Expense Coverage;
> caused by or resulting from any Covered Cause of Loss at the described premises; and
> b. Ends on the earlier of:
> (1) The date when the property at the described premises ***should be repaired, rebuilt or replaced*** with reasonable speed and similar quality; or
> (2) The date when business is resumed at a new permanent location.

(*Id.* at p. 9 of 9) (emphasis added). Thus, the Policies only provide coverage for business income or extra expense if the losses are caused by direct physical loss or damage resulting from a covered cause of loss. Even then, coverage is only provided for that time needed to repair, rebuild, or replace the lost or damaged property.

The Policies provide "Civil Authority" coverage. Again, consistent with the fundamental principle of a property insurance policy, direct physical loss or damage to property is required, and access to the premises must be prohibited:

> **a. Civil Authority**
> In this Additional Coverage, Civil Authority, the described premises are premises to which this Coverage Form applies, as shown in the Declarations.
> When a ***Covered Cause of Loss causes damage to property other than property at the described premises***, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by ***action of civil authority that prohibits access to the described premises***, provided that both of the following apply:
> (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority ***as a result of the damage***, and the described premises are within that area but are not more than one mile from the damaged property; and
> (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

(*Id.* at p. 2 of 9) (emphasis added). The Policies contain endorsements that modify the Civil Authority coverage, but none of those modifications change the basic coverage requirements of

direct physical loss of or damage to nearby property and a prohibition on access to the insured property because of such damage. (Policies, Exhibits A & B, Form CP 01 25 02 12, at p. 2 of 3).

The Policies also contain certain applicable exclusions, including broad pollution/contamination exclusions. (Policies, Exhibits A & B, Form NMA2342 and Form CP 10 30 10 12, at p. 4 of 10).

### B.    THE INSURANCE CLAIM

On March 26, 2020, Plaintiffs submitted claims for business interruption as a result of Florida state and local orders related to COVID-19 (the "Claims"). Plaintiffs then filed this lawsuit. (Doc. 1). In the SAC, Plaintiffs allege that the "the presence of COVID-19 has resulted in physical damage to property." (Doc. 38 ¶ 32). Plaintiffs also allege that they were "forced to suspend or reduce business" at the Properties. (*Id.* at ¶ 15). Notably, however, the SAC is devoid of any allegations that Plaintiffs' restaurants were, in fact, closed or that Plaintiffs (or their employees) were prohibited from accessing the premises as a result of COVID-19 or any related governmental orders. Similarly, the SAC fails to provide an adequate description of the "direct physical loss and damage," but instead gives an incomplete recitation of the various orders.[3]

On March 16, 2020, Boca Raton declared a State of Emergency, directing bars and nightclubs to close but permitted restaurants to stay open for take-out and delivery. (Doc. 38 ¶ 43; Exhibit C, City of Boca Raton Emergency Declaration).[4] On March 17, 2020, Florida Governor Ron DeSantis issued Executive Order ("EO") 20-68, directing restaurants to adhere to social distancing guidelines by limiting the number of patrons and requiring patrons to maintain a six-foot distance. (Doc. 38 ¶ 44; Exhibit D, Florida EO 20-68). On March 18, 2020, Coral Springs issued Emergency Order 2020-05, requiring restaurants and other places that serve food for consumption on premises to maintain a six-foot distance between patrons. (Doc. 38 ¶ 45; Exhibit E, Coral Springs Emergency Order 2020-05). On March 20, 2020, Governor DeSantis issued EO 20-71, requiring restaurants to suspend on-premises dining but allowing restaurants to remain

---

[3] Plaintiffs cite several governmental orders throughout the country, including an order from Broward County, to support the proposition that "many governmental bodies specifically found that COVID-19 causes property damage when issuing stay at home orders." (Doc. 38 ¶ 37). These orders are not relevant or applicable to the interpretation of a commercial property policy or the interpretation of the phrase "direct physical loss of or damage."

[4] The government orders are a matter of public record. When ruling on a motion to dismiss, this Court may consider matters of which judicial notice may be taken, including public records. *See Myers v. Foremost Ins. Co.*, No. 8:15-CV-1363-MSS-JSS, 2015 WL 12830477, at *3 (M.D. Fla. Oct. 23, 2015) (citing *SFM Holdings, Ltd. v. Banc of Am. Secs., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010)).

operational for delivery and take-out services. (Doc. 38 ¶ 46; Exhibit F, Florida EO 20-71). This order expressly allowed employees and other personnel to access the establishments. *(Id.)*.

On March 22, 2020, Broward County issued EO 20-01, directing the closure of non-essential businesses; however, restaurants were deemed essential. (Doc. 38 ¶ 47; Exhibit G, Broward County EO 20-01). On April 1, 2020, Governor DeSantis issued EO 20-91, directing individuals to stay at home except to obtain essential services. (Doc. 38 ¶ 50; Exhibit H, Florida EO 20-91). This order encouraged businesses to provide delivery and take-out services. (Exhibit H). On May 14, 2020, Governor DeSantis issued EO 20-123, allowing restaurants to resume indoor dining at 50% capacity and outdoor dining with social distancing measures. (Doc. 38 ¶ 51; Exhibit I, Florida EO 20-123). On June 3, 2020, Governor DeSantis issued EO 20-139, allowing bar areas at restaurants to open for seated service. (Doc. 38 ¶ 51; Exhibit J, Florida EO 20-139).

All these measures were put in place to slow the spread of COVID-19 by minimizing contact between residents.[5] These orders were not issued as a result of any "direct physical loss of or damage" to property, as required under the Policies to trigger coverage. Moreover, the orders did not "prohibit access" to the Properties, as they specifically allow employees and other personnel to enter the premises. In fact, the April 1, 2020 order encouraged restaurants to "provide delivery, carry-out or curbside service." (Exhibit H).

## II.   LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *See Jacobs v. Tempur-Pedic Int'l., Inc*., 626 F.3d 1327, 1332-33 (11th Cir. 2010). A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief," but must allege more than "labels and conclusions," "formulaic recitation of the elements of a cause of action," or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Courts are not required to accept the labels and legal conclusions in the complaint as true. *See Sinaltrainal v. Coca-Cola Co*., 578 F.3d 1252, 1261 (11th Cir. 2009).

To survive a motion to dismiss, a complaint must contain facts that, when assumed to be true, sufficiently "state a claim to relief that is *plausible on its face*." *Iqbal*, 556 U.S. at 678 (emphasis added). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

---

[5] All the Executive Orders are available at https://www.flgov.com/covid-19-executive-orders/.

alleged." *Id.; see also Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) ("conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal"). A complaint that does not "contain sufficient factual matter, accepted as true, to state a claim . . . plausible on its face" is subject to dismissal. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (citing *Twombly*, 550 U.S. at 570).

Moreover, "when the allegations of the complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (citation and quotations omitted).

## III.    ARGUMENT

### A.    PLAINTIFFS' SECOND AMENDED COMPLAINT FAILS TO ALLEGE DIRECT PHYSICAL LOSS OF OR DAMAGE TO INSURED PROPERTIES

The Policies provide coverage for business income and extra expense losses if such losses are the result of "direct physical loss of or damage to" the Properties. (Policies, Exhibits A & B, Form CP 00 30 10 12, at p. 1 of 9). Further, business income coverage and extra expense are only provided during the "period of restoration," which is the time it takes to repair, rebuild or replace the Properties. (Policies, Exhibits A & B, Form CP 00 30 10 12, at p. 9 of 9). Here, the SAC contains no plausible allegations of direct physical loss of or damage to the Properties, as evidenced by the failure to identify anything to repair, rebuild or replace at the Properties.

The plain language of the Policies "requires direct physical loss or damage to the properties in order to trigger payment" for a business income loss. *See Lubell & Rosen LLC v. Sentinel Ins. Co.*, No. 0:16-CV-60429-WPD, 2016 WL 8739330, at *4 (S.D. Fla. June 10, 2016). Florida law places the initial burden on an insured seeking to recover under an all-risk policy of proving that a loss occurred. *See S.O. Beach Corp. v. Great Am. Ins. Co. of N.Y.*, 305 F. Supp. 3d 1359, 1364 (S.D. Fla. 2018), *aff'd*, 791 F. App'x 106 (11th Cir. 2019). Accordingly, to recover for business income loss, Plaintiffs must plead and then prove that they sustained damage to the property that is insured by their Policies, that the damage was caused by a covered cause of loss, and that there was an interruption to their businesses that was caused by the property damage. *Dictiomatic, Inc. v. U.S. Fid. & Guar. Co.*, 958 F. Supp. 594, 602 (S.D. Fla. 1997).

This Court has concluded that "[a] direct physical loss 'contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that

repairs be made to make it so.'" *Mama Jo's, Inc. v. Sparta Ins. Co.*, No. 17-cv-23362-KMM, 2018 WL 3412974, at *9 (S.D. Fla. June 11, 2018), *aff'd*, No. 18-12887, 2020 WL 4782369 (11th Cir. Aug. 18, 2020) (quotations omitted)). The relevant inquiry is whether the structure continues to function. Indeed, "[t]he fact that the restaurant needed to be cleaned more frequently does not mean [the plaintiff] suffered a direct physical loss or damage." *Id.* Furthermore, as stated by the oft-cited Couch on Insurance, and as explicitly adopted by this Court:

> The requirement that the loss be "physical," given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.

*Id.* (quoting 10A Couch on Ins. § 148:46 (3d. Ed. West 1998)).

The Middle District of Florida recently applied *Mama Jo's* to dismiss a plaintiff's claims for business income and civil authority coverage related to COVID-19 because "Florida law. . . reflect[s] that actual, concrete damage is necessary." *Infinity Exhibits, Inc. v. Certain Underwriters at Lloyd's London Known as Syndicates PEM 4000*, No. 20-cv-1605-JSM-AEP, 2020 WL 5791583 at *3 (M.D. Fla. Sept. 28, 2020) (citing *Mama Jo's*, 2020 WL 4782369 at *8). In doing so, the court rejected the plaintiff's arguments that "pure economic losses" are covered. *Id.* at *4. This Court reached a similar conclusion in *Nahmad v. Hartford Cas. Ins. Co*., No 1:20-cv-22883-BLOOM/Louis, 2020 WL 6392841 at *6 (S.D. Fla. Nov. 2, 2020). There, this Court likewise rejected the plaintiff's argument that "economic damages alone without any corresponding physical harms to Covered Property is covered under the Policy." *Id.* at *8.[6] Florida state courts have reached the same results. *See Dab Dental PLLC v. Main St. Am. Prot. Ins. Co*., No. 2-CA-5504 (Fla. Hillsborough Cty. Ct. Nov. 10, 2020) (attached hereto as Exhibit K); *Dime Fitness, LLC, v. Markel Ins. Co*., No. 20-CA-5467 (Fla. Hillsborough Cty. Ct. Nov. 10, 2020) (attached hereto as Exhibit L).

Florida case law is in line with the recent decisions across the country— the overwhelming

---

[6] Underwriters also refer the Court to Judge Torres's Report & Recommendations finding that under Florida law, a property must suffer actual damage, and the emergency closure orders impacting businesses did not cause actual damage. *Malaube, LLC v. Greenwich Ins. Co*., No. 2022615CIVWILLIAMSTO, 2020 WL 5051581, at *8 (S.D. Fla. Aug. 26, 2020); *see also So. Fla. ENT Assocs., Inc. v. Hartford Fire Ins. Co*., No. 20-23677-Civ-WILLIAMS/TORRES, Dkt. 25 (S.D. Fla. Nov. 13, 2020) (recommending that insurer's motion to dismiss be granted because plaintiff failed to allege any actual harm to the insured property as required under Florida law) (a copy of this Report and Recommendation is attached hereto as Exhibit M).

majority of courts have found that the SARS-CoV-2 virus, the COVID-19 disease, and the related governmental orders are not direct physical loss or damage to property.[7] For example, the Southern District of California granted an insurer's motion to dismiss, finding that government orders restricting operations do not cause direct physical loss of or damage to property. *See Pappy's Barber Shops, Inc. v. Farmers Grp., Inc*., No. 20-CV-907-CAB-BLM, 2020 WL 5500221, at *4 (S.D. Cal. Sept. 11, 2020). Notably, the *Pappy's* plaintiff sought leave to amend its complaint to include allegations that SARS-CoV-2, or individuals infected with the virus, had likely entered the plaintiff's premises. *Pappy's Barber Shops, Inc. v. Farmers Grp., Inc.,* No. 20-CV-907-CAB-BLM, 2020 WL 5847570, at *1 (S.D. Cal. Oct. 1, 2020). The court denied the plaintiff's request, finding that even if these "speculative allegations" were true, "the presence of the virus itself, or

---

[7] *See Inns by the Sea v. Cal. Mut. Ins. Co.*, No. 20-cv-001274 (Cal. Super. Ct. Aug. 6, 2020) (granting insurer's demurrer to insured's COVID-19 related complaint) (Order and Transcript attached hereto as Exhibit N); *Plan Check Downtown III, LLC v. AmGuard Ins. Co*., No. CV 20-6954-GW-SKX, 2020 WL 5742712, at *6 (C.D. Cal. Sept. 10, 2020) (tentative order granting insurer's motion to dismiss); *Mark's Engine Co. No. 28 Restaurant, LLC v. Travelers Indem. Co. of Conn*., No. 2:20-cv-04423-AB-SK, 2020 WL 5938689 (C.D. Cal. Oct. 2, 2020) (granting insurer's motion to dismiss); *Wilson v. Hartford Cas. Co*., No. 2:20-cv-03384-ER, 2020 WL 5820800 (E.D. Pa. Sept. 30, 2020) (same); *Oral Surgeons, P.C. v. Cincinnati Ins. Co*., No. 4-20-cv-222-CRW-SBJ, 2020 WL 5820552 (S.D. Iowa Sept. 29, 2020) (same); *Vandelay Hosp. Grp. LP v. Cincinnati Ins. Co*., No. 3:20-CV-1348-D, 2020 WL 5946863 (N.D. Tex. Oct. 7, 2020) (same); *It's Nice, Inc. v. State Farm Fire & Cas. Co*., No. 20-L-547 (Ill. Cir. Ct., DuPage Cty. Sept. 29, 2020) (same) (A copy of this order is attached hereto as Exhibit O); *Founder Inst. Inc. v. Hartford Fire Ins. Co*., No. 20-cv-04466-VC, 2020 WL 6268539 (N.D. Cal. Oct. 22, 2020) (same); *Vizza Wash, LP v. Nationwide Mut. Is. Co.*, No. 5:20-cv-00680-OLG, 2020 WL6578417 (W.D. Tex. Oct 26, 2020) (same); *Boxed Foods Co. v. Cal. Capital Ins. Co*., No. 20-cv-04571-CRB, 2020 WL 6271021 (N.D. Cal. Oct. 27, 2020) (same); *W. Coast Hotel Mgmt., LLC v. Berkshire Hathaway Guard Ins. Cos*., No. 2:20-cv-05663-VAP-DFM, 2020 WL 6440037 (C.D. Cal. Oct. 27, 2020) (same); *Mac Prop. Grp. LLC v. Selective Fire & Cas. Ins. Co*., No. L-2629-20 (N.J. Super Ct. Camden Cty. Nov. 5, 2020) (A copy of this order is attached hereto as Exhibit P); *N&S Rest. LLC v. Cumberland Mut. Fire Ins. Co*., No. 20-05289 (RMK/KMW), 2020 WL 6501722 (D.N.J. Nov. 5, 2020); *Brian Handel D.M.D., P.C., v. Allstate Ins. Co.*, No. CV 20-3198, 2020 WL 6545893 (E.D. Pa. Nov. 6, 2020); *Goodwill Indus. of Cent. Okla. Inc. v. Phila. Indem. Ins. Co*., No. CV-20-511-R, Dkt. 24 (W.D. Okla. Nov. 9, 2020) (A copy of this order is attached hereto as Exhibit Q); *Chattanooga Prof'l Baseball LLC v. Nat'l Cas. Co*., No. CV-20-01312-PHX-DLR, 2020 WL 6699480 (D. Ariz. Nov. 13, 2020); *Soc. Life Magazine, Inc. v. Sentinel Ins. Co*., No. 20-cv-3311-VEC (S.D.N.Y. May 14, 2020) (denying insured's motion for preliminary injunction seeking coverage) (A copy of this order is attached hereto as Exhibit R); *Gavrilides Mgmt. Co. v. Mich. Ins. Co*., No. 20-000258-CB (Mich. Cir. Ct. July 1, 2020) (granting insurer's motion for summary disposition, which under Michigan law was on a motion to dismiss standard) (A copy of this Order is attached hereto as Exhibit S); *Musso & Frank Grill Co. v. Mitsui Sumitomo Ins. USA Inc*., No. 10STCV16681 (Cal. Los Angeles Cty. Super. Ct. Nov. 9, 2020) (A copy of this order is attached hereto as Exhibit T).

of individuals infected the virus, at Plaintiffs' business premises or elsewhere do not constitute direct physical losses of or damage to property." *Id*. Here, Plaintiffs make similar speculative allegations regarding the "spread or presence" of COVID-19 on their Properties, but the SAC is devoid of any facts supporting such conclusory statements. (Doc. 38 ¶ 56).

The Western District of Texas and the Northern District of Illinois likewise granted insurers' motions to dismiss because the insureds failed to sufficiently allege "direct physical loss" caused by COVID-19 or related government orders. *Diesel Barbershop, LLC v. State Farm Lloyds*, No. 5:20-CV-461-DAE, 2020 WL 4724305 (W.D. Tex. Aug. 13, 2020); *Sandy Point Dental, PC v. Cincinnati Ins. Co*., No. 20 CV 2160, 2020 WL 5630465 (N.D. Ill. Sept. 21, 2020). Notably, both courts found the phrase "direct physical loss" requires "distinct demonstrable physical alteration of the property" and rejected the argument that "direct physical loss" includes loss of use of property without some actual physical impact on the property. *Diesel Barbershop*, 2020 WL 4724305, at *5; *Sandy Point*, 2020 WL 5630465, at *2 ("[t]he coronavirus does not physically alter the appearance, shape, color, structure, or other material dimension of the property").

The Central District of California and a superior court in the District of Columbia held that the government-ordered closure of restaurants because of COVID-19 was not "direct physical loss" to trigger business income coverage. *See 10E, LLC v. Travelers Indem. Co. of Conn*., No. 2:20-cv-04418-SVW-AS, 2020 WL 5359653, at *5 (C.D. Cal. Sept. 2, 2020); *Rose's 1, LLC v. Erie Ins. Exchange*, No. 2020 CA 002424 B, 2020 WL 4589206 (D.C. Super. Aug. 06, 2020). In *10E*, the court found that even if "loss" encompasses "permanent dispossession," the plaintiff had not alleged it was permanently dispossessed of its property as the plaintiff "remained in possession of its dining room, bar, flatware, and all of the accoutrements of its" property. *10E*, 2020 WL 4589206 at *5; *see also Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am*., No. 20-CV-03213-JST, 2020 WL 5525171, at *6 (N.D. Cal. Sept. 14, 2020) (noting that the insured's dispossession was not permanent as the insured would regain possession once the orders are lifted). Here, Plaintiffs have not alleged they were permanently dispossessed of their Properties, and in fact allege that they have resumed operations. (Doc. 38 ¶¶ 57, 59).

In *Rose's 1*, consistent with the emerging majority position, the court held that the governmental orders "did not have any effect on the material or tangible structure of the insured properties." *Rose's 1*, 2020 WL 4589206, at *2; *see also Turek Enters., Inc. v. State Farm Mut. Auto. Ins. Co.*, No. 20-11655, 2020 WL 5258484, at *8 (E.D. Mich. Sept. 3, 2020) (dismissing COVID-19 related complaint because insured failed to "demonstrate some tangible damage to"

property). The *Rose's 1* court found that no cases cited by the insured stood for the proposition that a government order, "standing alone, constitutes a direct physical loss under an insurance policy." *Rose's 1*, 2020 WL 4589206, at *3. The court further noted that property insurance policies do not provide coverage "when a business's closure was not due to direct physical harm to the insured premises." *Id*. at *4. Consistent with the case law cited here, the court held that the governmental orders "did not have any effect on the material or tangible structure of the insured properties," and thus, the property did not suffer direct physical damage. *Id*. at *2; *see also Henry's La. Grill, Inc. v. Allied Ins. Co. of Am.*, No. 1:20-CV-2939-TWT, 2020 WL 5938755, at *4 (N.D. Ga. Oct. 6, 2020) ("Under the [p]laintiffs' logic, a minute before the Governor issued the Order, the dining rooms existed in one state. A minute later, the Governor issued the Order, and the restaurant underwent a direct physical change that left the dining rooms in a different state.").

Here, Plaintiffs allege that "[d]ue to COVID-19, their property has become unsafe for its intended purpose and thus has suffered physical loss or damage. Their properties' business functions have been impaired. If they were to conduct business as usual, the disease and virus would show up and people would get sick." (Doc. 38 ¶ 30).[8] Further, in the SAC, Plaintiffs unsuccessfully attempt to rectify the shortcomings of their Complaint and Amended Complaint by alleging that "the functional space in the [Properties] has been diminished by the spread of COVID-19… the indoor dining room lost its normal functionality and the space could not be used for at least several months." (*Id*. at ¶ 57). Such strained arguments fail for several reasons.

First, in *Mama Jo's*, this Court rejected the notion that loss of use equates to physical damage. *Mama Jo's*, 2018 WL 3412974, at *9. This decision was affirmed on August 18, 2020, by the Eleventh Circuit where the court found that

> A "loss" is the diminution of value of something . . ."Direct" and "physical" modify loss and impose the requirement that the damage be actual . . . With regard to the cleaning claim . . . "cleaning and painting" was all that was required. . . there was no need for removal or replacement of items at that time . . .  under Florida law, an item or structure that merely needs to be cleaned has not suffered a "loss" which is both "direct" and "physical."

*Mama Jo's Inc. v. Sparta Ins. Co.,* No. 18-12887, 2020 WL 4782369 at *8 (11th Cir. Aug. 18,

---

[8] Plaintiffs' allegations that the Properties are "unsafe" because the "virus would show up and people would get sick" demonstrates that the danger posed by COVID-19 threatens human health, not property. As such, the "overwhelming majority of courts that have determined that the mere threat of coronavirus cannot cause a 'direct physical loss of or damage to' covered property as required under the Policy." *Water Sports Kauai, Inc. v. Fireman's Fund Ins. Co*., No. 20-cv-03750-WHO, 2020 WL 6562332, at *3 (N.D. Cal. Nov. 9, 2020).

2020) (quotations and citations omitted). Several other courts have recognized the principle that mere loss of use does not equate to direct physical loss of or damage to property. *See Mudpie*, 2020 WL 5525171, at *6 ("'direct physical loss of . . . property' clause was not intended to encompass a loss where the property was rendered unusable without an intervening physical force."); *Sandy Point*, 2020 WL 5630465 at *2; *Turek Enter.*, 2020 WL 5258484 at *7; *Hillcrest Optical v. Cont'l Cas. Co.*, No. 1:20-cv-275-JB-B, 2020 WL 6163142 at *7 (S.D. Ala. Oct. 21, 2020) ("Plaintiff's loss of usability did not result from an immediate occurrence which tangibly altered its property— the [o]rder did not immediately cause some sort of tangible alteration to Plaintiff's office."). Here, Plaintiffs' allegations solely amount to a claim for loss of use without any sort of intervening physical force or tangible damage to the Properties, which is not covered under the Policies.[9]

Plaintiffs also allege the presence of SARS-CoV-2 causes property damage, but this allegation concerning the omnipresence of the virus is not enough to establish a direct physical loss. (Doc. 38 ¶ 55). *See Pappy's, 2020 WL 5847570*, at *1. The alleged presence of COVID-19 is like the presence of the road dust in *Mama Jo's*. *Mama Jo's*, 2020 WL 4782369 at *8  If road dust on an insured's property that requires cleaning does not cause physical loss or damage, then a virus that is invisible to the naked eye, and which can also be cleaned effectively with something as simple as Lysol spray, would also not cause such physical loss or damage. *See also Dab Dental*, No. 20-CA-5504 at p. 5 ("the mere presence of covid-19 on business premises does not constitute a direct physical loss of or damage to property."); *Uncork & Create LLC, v. Cincinnati Ins. Co.*, No. 2:20-cv-00401, 2020 WL 6436948 (S.D. W. Va. Nov. 2, 2020) ("[E]ven when present, COVID-19 does not threaten the inanimate structures covered by property insurance policies, and its presence on surfaces can be eliminated with disinfectant.").

Plaintiffs also allege they had to "repair" the harm COVID-19 caused to the air and surfaces

---

[9] *See also Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 331 (S.D.N.Y. 2014) ("The words 'direct' and 'physical,' which modify the phrase 'loss or damage,' ordinarily connote actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure."); *Roundabout Theatre Co. v. Continental Casualty Co.*, 302 A.D.2d 1, 7 (N.Y. App. Div. 2002) (rejecting argument that "loss" should be read to include "loss of use" and holding there was no "direct physical loss or damage" after the insured's theatre became inaccessible because of a nearby street closure when the policy unambiguously required direct physical damage to the insured premises for coverage); *cf. Pentair Inc. v. Am. Guar. & Liab. Ins. Co.*, 400 F. 3d 613, 615 (8th Cir. 2005) (finding the inability of an insured's suppliers to function after a power failure did not constitute physical loss or damage to the premises as adopting the insured's reasoning "would mean that direct physical loss or damage is established *whenever* property cannot be used for its intended purpose") (emphasis in original).

of the Properties by installing special filters, air conditioners, plexiglass barriers, redesigning the floor plan and rearranging tables. (Doc. 38 ¶ 58). Plaintiffs further allege that these changes constitute "structural alterations, changes and/or repairs made to the [Properties] so that Plaintiffs can continue their business after experiencing direct property damage which was caused by COVID-19." (*Id*.). The rearranging of tables and installation of partitions and special filters would not result in any direct physical loss of or damage, as this would not affect the existing structure or the Properties' ability to function. *Cf. Mama Jo's*, 2018 WL 3412974, at \*9. Additionally, even if moving tables and installing partitions and filters were damage to the Properties (which it is not), the suspension of Plaintiffs' operations was not caused by such activities. The Business Income coverage requires that the suspension of operations be ***caused by*** direct physical loss of or damage to insured property. The suspension was not caused by changes needed to reopen the business, but by the government prior orders designed to slow the spread of the virus, which is not physical loss or damage to insured property, as courts have overwhelmingly held. Plaintiffs also allege that their furniture suffered rain and humidity damage. (Doc. 38 ¶ 59). Again, any alleged damages to furniture were not the cause of any suspension in operations.

Plaintiffs' remaining allegations concerning their "direct physical losses and damage" are solely economic in nature and do not relate to any sort of physical damage and, therefore, are not covered under the Policies. *See Infinity Exhibits,* 2020 WL 5791583 at \*3; *Nahmad*, 2020 WL 6392841 at \*6; *Sandy Point Dental*, 2020 WL 5630465 at \*3 ("In essence, plaintiff seeks insurance coverage for financial losses as a result of the closure orders. . . plaintiff has failed to plead a direct physical loss—a prerequisite for coverage.").[10] Moreover, multiple courts have rejected similar strained interpretations of the phrase "direct physical loss of or damage." *See, e.g. 10E,* 2020 WL 5359653 at \*5 (referring to the complaint as "artfully plead").

---

[10] *See also Real Hosp., LLC v. Travelers Cas. Ins. Co. of Am.,* No. 2:20-cv-00087-KS-MTP, 2020 WL 6503405 at \*8 (S.D. Miss. Nov. 4, 2020) ("Plaintiff's operations are not what is insured—the building and the personal property in or on the building are."); *Soc. Life Magazine*, Exhibit R at 15:13-16 ("[T]his kind of business interruption needs some damage to the property . . .You get an A for effort, you get a gold star for creativity, but this is just not what's covered under these insurance policies."); *Gavrilides*, Exhibit S at 20:12-15 ("[P]laintiff is saying that the physical requirement is met because people were physically restricted from dine-in services. But, that argument is just simply nonsense."); *Henry's*, 2020 WL 5938755 at \*4 ("This interpretation. . . exceeds any reasonably bounds of possible construction, pushing the words individually and collectively beyond what any plain meaning can support.").

FIELDS HOWELL LLP | 9155 SO. DADELAND BLVD. | SUITE 1012| MIAMI, FL 33156| T: 786-870-5600 | F: 855-802-5821

CASE NO.: 0:20-cv-61741-RS

Additionally, the Policies only provide coverage for business income and extra expense losses that occur during the "period of restoration," which begins with the "direct physical loss or damage" and ends on the earlier of "(1) The date when the property at the described premises should be repaired, rebuilt or replaced . . . or (2) The date when business is resumed at a new permanent location." (Policies, Exhibits A & B, Form CP 00 30 10 12, at p. 9 of 9). Thus, for there to be coverage under the Policies' business income or extra expense coverage, Plaintiffs' losses must involve some physical damage to covered property that needs to be repaired, rebuilt, or replaced. Here, the SAC lacks any mention of what, how, and when the physical damage occurred, and what needs to be repaired, replaced, or rebuilt.

As explained by the Southern District of New York, "the words 'repair' and 'replace' contemplate physical damage to the insured premises as opposed to loss of use of it." *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 332 (S.D.N.Y. 2014) (citations omitted); *see also Henry's*, 2020 WL 5938755, at *5 (finding that the policy's definition of "period of restoration" supported "an understanding that 'loss of' means total destruction while 'damage to' means some amount of harm or injury."); *Real Hosp.*, 2020 WL 6503405 at *6 ("If there is no requirement that physical loss of or physical damage to the property to be involved, the definition of [period of restoration] makes no sense.").

Any other reading of the Policies to allow recovery for Plaintiffs' Claims would render central contract terms superfluous. Under Florida law, "insurance contracts are construed according to their plain meaning." *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005). Further, "courts must not construe insurance policy provisions in isolation, but instead should read all terms in light of the policy as a whole, with every provision given its full meaning and operative effect." *Office Depot, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 734 F. Supp. 2d 1304, 1314 (S.D. Fla. 2010) (citations omitted). Thus, under the plain language of the Policies, coverage is only afforded for business income and extra expense losses if those losses are caused by direct physical loss or damage. The SAC fails to allege any facts that trigger that coverage.

### B. PLAINTIFFS HAVE NOT PLED A VALID "CIVIL AUTHORITY" CLAIM

In the SAC, Plaintiffs merely allege the subject government orders prohibited access to their Properties, as well as the "area immediately surrounding" the Properties with no explanation of *how* access to the Properties and the area immediately surrounding the Properties were

13

prohibited or *how* nearby property was damaged. (Doc. 38 ¶ 60).[11] However, these orders did not require the restaurants to close or prohibit access to the surrounding areas. In fact, Governor DeSantis encouraged all restaurants to continue providing take-out, delivery, and curbside services as essential businesses. (*See* Exhibit H).

Plaintiffs appear to assert that the subject government orders somehow trigger the Policies' coverage extension for civil authority coverage. (*See* Doc. 38 ¶¶ 16, 37, 88, 122). However, "[c]ivil authority coverage is intended to apply to situations where access to an insured's property is prevented or prohibited by an order of civil authority issued as a direct result of physical damage to other premises in the proximity of the insured's property." *See, e.g.*, *Dickie Brennan & Co. v. Lexington Ins. Co.*, 636 F.3d 683, 686-87 (5th Cir. 2011). As explained above, COVID-19 does not cause physical damage or loss to property, and therefore, Plaintiffs cannot satisfy the conditions of the civil authority coverage extension. *See, e.g.*, *Dime Fitness*, 20-CA-5467 at p. 6 (holding civil authority was not triggered because there was no damage to other property and orders were not issued in response to dangerous physical condition); *Travelers Cas. Ins. Co. of Am. v. Geragos & Geragos*, No. 2:20-cv-03619-PSG-E, 2020 WL 615684, at *4 (C.D. Cal. Oct. 19, 2020) (denying claim for civil authority coverage because insured failed to plead a covered cause of loss); *Turek Enters.*, 2020 WL 5258484, at *5 (stating civil authority coverage dispute was "tangential" because it turned on whether plaintiff had "alleged a covered cause of loss"); *Diesel Barbershop*, 2020 WL 4724305, at *7 (holding civil authority coverage was not triggered because there was no covered cause of loss) (citing *Dickie Brennan*, 636 F.3d 683). Even looking beyond that shortcoming, there are two more reasons why Plaintiffs cannot fulfill the conditions of the civil authority coverage extension: (1) access to the Properties has not been "prohibited;" and (2) the subject government orders were not taken "in response" to damaged property.

First, Plaintiffs' conclusory allegations that the subject government orders "prohibited access" to their Properties "and the area immediately surrounding" their Properties are demonstrably false. (Doc. 38 ¶ 60). As previously detailed, Plaintiffs were never required to cease delivery, take-out, or pick-up services. No government order prevented Plaintiffs themselves, or their employees, from entering the Properties, and indeed certain orders actually encouraged access. While this Court has not yet considered the issue, other jurisdictions have recognized that similar government orders taken in response to the COVID-19 pandemic do not "prohibit access" to property. *See Handel*, 2020 WL 6545893, at *4 ("[T]he Governor's orders limit, rather than

---

[11] Plaintiffs merely recite the language from the Policies' civil authority provision.

prohibit, access to the property"); *Geragos & Geragos*, 2020 WL 6156584, at *3 (finding order "did not actually prohibit access . . . because the [insured] law firm was deemed essential"); *Seifert v. IMT Ins. Co.*, No. 20-1102, 2020 WL 6120002, at * (D. Minn. Oct. 16, 2020) (holding insured failed to plead facts demonstrating access to property was prohibited by civil authority, despite orders prohibiting use of the property); *Sandy Point Dental*, 2020 WL 5630465, at *3 (holding civil authority did not prohibit access to insured dental office that remained open for emergency and non-elective work); *Pappy's*, 2020 WL 5500221, at *6 ("[T]he civil authority coverage provision only provides coverage to the extent that aces to the [insured's] physical premises is prohibited, and not if [the insured is] simply prohibited from operating [its] business.").

Moreover, courts have also recognized that government orders that hamper access to insured property—but do not entirely *prohibit* it— are insufficient to trigger civil authority coverage. *See, e.g.*, *S. Hosp., Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137, 1140 (10th Cir. 2004) (upholding denial of hotel operators' claim for lost business income sustained when customers cancelled visits due to order grounding flights after 9/11 attacks); *Kean, Miller, Hawthorne, D'Armond McCowan & Jarman, LLP v. Nat'l Fire Ins. Co. of Hartford*, No. 06-770-C, 2007 WL 2489711, at *1 (M.D. La. Aug. 29, 2007) (holding civil authority provision was not triggered by government order prior to Hurricane Katrina advising residents to stay off the streets because order did not "prohibit access" to the insured premises); *54th St. Partners v. Fid. & Guar. Ins. Co.*, 305 A.2d 67, 67 (N.Y. Super. Ct. App. Div. 2003) (holding civil authority extension did not apply to insured's business income claim due to city government's diversion of traffic, because access to the restaurant was not denied). Since the civil authority extension requires Plaintiffs to show that access to their Properties was "prohibited" by civil authority, and Plaintiffs did not make any such allegations (nor indeed could they), the civil authority coverage does not apply.

Second, the subject government orders were not issued "in response" to physical damage to nearby property. Rather, the orders were issued as precautionary measures to prevent the further spread of COVID-19. In such situations, the civil authority extension is not triggered. *See Syufy Enter. v. Home Ins. Co. of Ind.*, No. 94-0756 FMS, 1995 WL 129229 (N.D. Cal. Mar. 21, 1995). In *Syufy*, after the return of the Rodney King verdict and subsequent riots, three cities imposed dawn-to-dusk curfews. *Id.* at *1. An insured movie theater operator, who ran theaters in all three cities, brought a business interruption claim because it closed its theaters during these curfew periods. *Id.* The court concluded there was no civil authority coverage because not only did the civil orders not specifically prohibit individuals from entering the theaters, but the "requisite causal

link between damage to adjacent property and denial of access to a Syufy theater [was] absent." *Id.* at \*2. In other words, Syufy had closed its theaters as a "direct result of the city-wide curfews," not as a result of adjacent property damage. Furthermore, the court noted that even though the curfews were imposed to "prevent" property damage, they were not the result of the damage itself. *Id.* at \*2. Other courts have reached similar conclusions in the context of the COVID-19 pandemic. *See Mudpie*, 2020 WL 5525171, at \*7 ("Because the orders were preventative . . . the complaint does not establish the requisite causal link between prior property damage and the government's closure order." (citing *Syufy*, 1995 WL 129229); *see also Franklin EWC, Inc. v. Hartford Fin. Servs. Grp., Inc.*, No. 20-cv-04434-JSC, 2020 WL 5642483, at \*2 (N.D. Cal. Sept. 22, 2020) ("[T]he Closure Orders cannot have been issued as a result of the Closure Orders; instead, as the complaint repeatedly alleges, they were issued as a direct result of COVID-19," which is not a covered cause of loss.).[12]

Plaintiffs cannot establish that physical damage occurred due to COVID-19, nor can they establish that the government orders, as specified and incorrectly characterized in the SAC, prohibited access to the Properties. Moreover, these government orders were not taken "in response" to physical damage, but were instead preventative measures issued for public health purposes. Accordingly, the Policies' civil authority coverage is not triggered.

## C.    COVERAGE IS BARRED BY THE CONTAMINATION EXCLUSIONS

The SAC must be dismissed because Plaintiffs' Claims are excluded by the plain language of the Policies. When resolving insurance coverage disputes, courts "routinely dismiss complaints for failure to state a claim when a review of the insurance policy . . . unambiguously reveals that the underlying claim is not covered." *Cammarota v. Penn-Am. Ins. Co.*, No. 17-CV-21605-

---

[12] Beyond the context of the COVID-19 pandemic, other jurisdictions have reached conclusions aligned with the principles delineated in *Syufy*. *See United Airlines, Inc. v. Ins. Co. of State of Pa.*, 385 F. Supp. 2d 343, 353 (S.D.N.Y. 2005) (holding civil authority coverage did not apply to airport's business interruption claim arising from order grounding flights and barring access to the airport after 9/11, because the order was "to prevent further attacks and as a matter of national security," not because of damage to the Pentagon); *City of Chi. v. Factory Mut. Ins. Co.*, No. 02-C-7023, 2004 WL 549447, at \*4 (N.D. Ill. Mar. 18, 2004) ("The business interruption . . . was due to the ground stop order imposed by the FAA in order to prevent further terrorist attacks."); *cf. Prime Alliance Grp., Ltd. v. Hartford Fire Ins. Co.*, No. 06-22535-CIV-UNGARO, 2007 WL 9703576, at \*4 (S.D. Fla. Oct. 19, 2007) ("[A] plain language reading of this section provides coverage when a peril—such as a windstorm—causes damage to property and, as a result, access to property is precluded by a civil authority order. The order of civil authority cannot in any reasonable manner be construed as a 'peril.'").

Williams, 2017 WL 5956881, at *2 (S.D. Fla. Nov. 13, 2017); *see also Arias-Bonello v. Progressive Select Ins. Co.*, No. 0:17-CV-60897-UU, 2017 WL 7792704, at *5 (S.D. Fla. Aug. 8, 2017) (dismissing putative class member's breach of contract claims because the claims were expressly excluded from the policy). Here, even if Plaintiffs could plead claims within the Policies' coverage grants (which they have not), the Policies contain two enforceable exclusions barring coverage for contaminants and contamination. First, the Policies provide:

> SEEPAGE AND/OR POLLUTION AND/OR CONTAMINATION EXCLUSION USA & CANADA
>
> Notwithstanding any provisions to the contrary within the Policy of which this Endorsement forms part (or within any other Endorsement which forms part of this Policy, this ***Policy does not insure***:
>
> (a) ***any loss, damage, cost or expense***, or
>
> (b) any increase in insured loss, damage, cost or expense…
>
>                              \* \* \*
>
> which arises from any kind of seepage or any kind of pollution and/or contamination, or threat thereof, whether or not caused by or resulting from a Peril Insured, or from steps or measures taken in connection with the avoidance, prevention, abatement, mitigation, remediation, clean-up or removal of such seepage or pollution and/or contamination or threat thereof.
>
>                              \* \* \*
>
> The term '***any kind of seepage or any kind of pollution and/or contamination***' as used in this Endorsement includes (but not limited to):
>
> (a) seepage of, or pollution and/or contamination by, anything, including but not limited to, any material designated as 'hazardous material' by the United States Environmental Protection Agency or as 'hazardous material' by the United States Department of Transportation, or defined as a 'toxic substance' by the Canadian Environmental Protection Act for the purposes of Part II of that Act, or any substance designated or defined as toxic, dangerous, hazardous or deleterious to persons or the environment under any Federal, State, Provincial, Municipal or other law, ordinance or regulation; and
>
> (b) ***the presence, existence, or release of anything which endangers or threatens to endanger the health, safety or welfare of persons*** or the environment.

(Policies, Exhibits A & B, Form NMA2340) (emphasis added).[13] The Policies also exclude any "loss or damage caused by or resulting from" the "[d]ischarge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss." (Policies, Exhibits A & B, Form CP 10 30 10 12, at p. 4 of 10). The term "pollutant" is defined, in part, as "any solid, liquid gaseous

---

[13] Notably, the "pollutant/contamination" exclusion applies "[n]otwithstanding any provision to the contrary" and it does not replace or supersede any similar provisions.

or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (Policies, Exhibits A & B, Form CP 00 30 10 12, at p. 9 of 9). Under the plain language of either of these exclusions (collectively, the "Contamination Exclusions"), and Florida law, coverage for the Claims is excluded.

The Florida Supreme Court has recognized that pollution exclusions extend beyond merely "environmental or industrial pollution." *Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1138 (Fla. 1998) (holding claim arising from an ammonia spill fell within pollution exclusion). Instead, the plain language of pollution exclusions should be enforced as written and courts should not "place limitations upon the plain language of a policy exclusion simply because [they] may think it should have been written that way." *Id.* at 1139. This includes the term "contaminant," which the Florida Supreme Court held to be unambiguous. *See id.*

SARS-CoV-2 undoubtedly qualifies as "contamination."[14] This Court has recognized that "living organisms," "microbial populations," "microbial contaminants," and "indoor allergens" fit the ordinary definition of a "contaminant." *Nova Cas. Co. v. Waserstein*, 424 F. Supp. 2d 1325, 1334 (S.D. Fla. 2006). In *Nova*, the Court reasoned these substances "infected the plaintiffs' bodies or made them impure by contact, thereby fitting the ordinary meaning of a 'contaminant,' and having an effect commonly known as 'contamination.'" *Id.* Relatedly, a pollution exclusion has been expressly held to exclude coverage for a claim arising from "viral contaminants" and "harmful microbe[s]" found in an insured's swimming pool, from which a guest alleged that he contracted the Coxsackie virus. *See First Specialty Ins. Corp. v. GRS Mgmt. Assocs., Inc.*, No. 08-81356-CIV, 2009 WL 2524613, at *4-5 (S.D. Fla. Aug. 17, 2009); *see also James River Ins. Co. v. Epic Hotel, LLC*, No. 11-CV-24292-UU, 2013 WL 12085984, at *4 (S.D. Fla. Jan. 9, 2013) (pollution exclusion barred claims arising from Legionnaire bacteria). Other courts have reached analogous conclusions. *See, e.g.*, *U.S. Fire Ins. Co. v. City of Warren*, 87 F. App'x 485, 487, 490 (6th Cir. 2003) (applying pollution exclusion to sewage water that was alleged to contain "pathogens, carcinogens, and disease carrying organisms including but not limited to HIV viruses, *e. coli* bacteria, hepatitis (all strains), and other bacteria"); *Certain Underwriters at Lloyd's London v. B3, Inc.*, 262 P.3d 397, 400-401 (Okla. Ct. App. 2011) (pollution exclusion applied to claim stemming from contaminated water alleged to contain "bacteria (including E. Coli) [and] viruses").

---

[14] Plaintiffs concede this point in the SAC, in which they describe a scientific study that found, "following COVID-19 *contamination*, the virus could be detected hours later for issues and paper . . . ." (Doc. 38 ¶ 39).

FIELDS HOWELL LLP | 9155 SO. DADELAND BLVD. | SUITE 1012| MIAMI, FL 33156| T: 786-870-5600 | F: 855-802-5821

The Policies' definitions of "contamination" and "pollutant" unambiguously encompass SARS-CoV-2 and the disease it causes. Just as this Court reasoned in *Nova*, SARS-CoV-2 is a virus that infects peoples' bodies, thereby fitting the ordinary meaning of "contaminant." *Nova Cas. Co.* 424 F. Supp. 2d at 1334. Similarly, under exclusions like the Policies' "pollution exclusion," claims stemming from viruses are precluded from coverage, as demonstrated by this Court's decision in *First Specialty Ins. Corp*. *See* 2009 WL 2524613, at *4-5. SARS-CoV-2 has been "designated or defined" as "dangerous" by both Federal and State ordinances or regulations. Indeed, the U.S. Department of Health and Human Services has determined that the "SARS coronavirus" (SARS-CoV), to which SARS-CoV-2 is related,[15] is a "biological agent . . . and toxin" with "the potential to pose a severe threat to public health and safety." 42 C.F.R. § 73.3(a) & (b) (2017). Moreover, in the subject orders issued by Governor DeSantis, the Governor stated that he is "responsible for meeting the *dangers* presented to this state and its people by [COVID-19]." (Exhibit F (emphasis added); *see also* Exhibit H). Thus, COVID-19 has been defined as dangerous to human health by both the federal government and government of Florida.

Having established that SARS-CoV-2 would qualify as a pollutant and/or contaminant under the Policies and Florida law, the Contamination Exclusions clearly apply, given that they exclude coverage for claims "arising from" or "resulting from" contamination. (Policies, Exhibits A & B, Form NMA2340). Causation phrases such as these are broadly construed in Florida. *See Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005) (holding causation phrase "arising out of" is broader than "caused by" as used in an exclusion). Moreover, Plaintiffs assert that the subject government orders, which give rise to their Claims, were issued "in response to the rapid spread of COVID-19 throughout Florida." (Doc. 38 ¶ 54). Accordingly, the Claims as alleged arose from or resulted from COVID-19 and are excluded from coverage under the Policies.

### D.   COUNTS I, II, III AND IV FAIL TO ALLEGE UNDERWRITERS HAVE BREACHED THE POLICIES

Plaintiffs have not stated valid claims for breach of contract. To sufficiently plead a claim for breach of contract under Florida law, a plaintiff must assert the existence of a contract, a breach of such contract, and damages resulting from such breach. *Knowles v. C.I.T. Corp*., 346 So.2d

---

[15] *See COVID-19, MERS & SARS*, NAT'L INST. OF ALLERGY & INFECTIOUS DISEASES (April 6, 2020), https://www.niaid.nih.gov/diseases-conditions/covid-19; Alping Wu, et al, *Genome Composition & Divergence of the Novel Coronavirus (2019-nCov) Originating in China*, Commentary, 27 Cell Host & Microbe 325, 326 (Mar. 11, 2020) ("[T]he 2019-nCov is in the same *Betacoronavirus* clade as MERS-CoV, SARS-like bat CoV, and SARS-CoV.").

1042, 1043 (Fla. 1st DCA 1977). Underwriters have not breached the Policies because there is no coverage for Plaintiffs' Claims. Accordingly, Plaintiffs have failed to sufficiently plead that coverage is provided by the Policies, as the express language of the Policies expressly contradicts Plaintiffs' allegations that their losses are covered under the Policies. *See Cruz v. Underwriters at Lloyd's London*, No. 8:14-CV-1539-T-33TBM, 2014 WL 3809179, at *4 (M.D. Fla. Aug. 1, 2014) (finding that plaintiff failed to sufficiently plead that its loss was covered under a policy, since the express language of an exclusion contradicted plaintiff's allegations that its claim was covered).

Furthermore, with regards to Plaintiffs' "Sue and Labor" claim, it is well-settled that "Sue and Labor" clauses require that "an actual covered loss must have occurred or be in process before the [insured] can recover under this provision for the expenses claimed." *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 168 (Fla. 2003); *see also Residences at Ocean Grande, Inc. v. Allianz Global Risks U.S. Ins. Co.*, No. 07-22656-CIV, 2009 WL 7020044, at *14 (S.D. Fla. Sept. 9, 2009). The Policies' Sue and Labor clauses specifically state that Underwriters "will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss." (Policies, Exhibits A & B, Form CP 00 30 10 12, p. 5 of 9). For the reasons set forth above, there is no covered loss under the Policies, and thus, the Sue and Labor provisions are not triggered. Accordingly Counts I, II, III, and IV for breach of contract must be dismissed.

## IV.   CONCLUSION

Plaintiffs have failed to satisfy their burden to plead facts that would give rise to a covered claim. Additionally, Plaintiffs cannot allege facts that sufficiently demonstrate they have suffered direct physical loss of or damage to their Properties. Even if Plaintiffs could allege a covered cause of loss, their Claims are unambiguously excluded under the Policies' Contamination Exclusions

Thus, for the foregoing reasons, Underwriters respectfully request the Court dismiss Plaintiffs' SAC.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was filed this 16th day of November 2020 using the Court's CM/ECF filing system, which will send notice of the same to all interested persons, and served via email to those listed in the attached Service List.

FIELDS HOWELL LLP
Attorneys for Defendants, Underwriters

CASE NO.: 0:20-cv-61741-RS

9155 So. Dadeland Blvd.
Suite 1012
Miami, FL 33156
Tel:  (786) 870-5600
Fax: (855) 802-5821

By:*/s/ Armando P. Rubio*
    Armando P. Rubio, Esq.
    Florida Bar No. 478539
    arubio@fieldshowell.com
    service@fieldshowell.com

CASE NO.: 0:20-cv-61741-RS

## SERVICE LIST

Greg G. Gutzler
DICELLO LEVITT GUTZLER LLC
444 Madison Avenue, Fourth Floor
New York, New York 10022
ggutzler@dicellolevitt.com

Adam J. Levitt
Amy E. Keller
Daniel R. Ferri
Mark Hamill
Laura E. Reasons
DICELLO LEVITT GUTZLER LLC
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
alevitt@dicellolevitt.com
dferri@dicellolevitt.com
mhamill@dicellolevitt.com

Mark A. DiCello
Kenneth P. Abbarno
Mark Abramowitz
DICELLO LEVITT GUTZLER LLC
7556 Mentor Avenue
Mentor, Ohio 44060
madicello@dicellolevitt.com
kabbarno@dicellolevitt.com
mabramowitz@dicellolevitt.com

Mark Lanier
Alex Brown
Skip McBride
THE LANIER LAW FIRM PC
10940 West Sam Houston Parkway North
Suite 100
Houston, Texas 77064
WML@lanierlawfirm.com
alex.brown@lanierlawfirm.com
skip.mcbride@lanierlawfirm.com

Evan Janush
THE LANIER LAW FIRM PC
126 East 56th Street, Sixth Floor
New York, New York 10022
Evan.Janush@LanierLawFirm.com

Timothy W. Burns
Jeff J. Bowen
Jesse J. Bair
Freya K. Bowen
BURNS BOWEN BAIR LLP
One South Pinckney Street, Suite 930
Madison, Wisconsin 53703
tburns@bbblawllp.com
jbowen@bbblawllp.com
jbair@bbblawllp.com
fbowen@bbblawllp.com

Douglas Daniels
DANIELS & TREDENNICK
6363 Woodway, Suite 700
Houston, Texas 77057
douglas.daniels@dtlawyers.com